Andrew DOLCHOK, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 3920, 4596.

Supreme Court of Alaska.

Jan. 22, 1982.

Phillip Paul Weidner, Drathman & Weidner, Anchorage, for appellant.

W. H. Hawley, Jr., Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and SCHULZ, Superior Court Judge.*

* Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

## OPINION

RABINOWITZ, Chief Justice.

This case involves consolidated appeals from different but related proceedings. The first is an appeal from a post-conviction proceeding, and the second is an appeal from the partial new trial ordered at the conclusion of the post-conviction proceeding. We affirm.

A. *History.*

1. *First trial.*

On July 8, 1971, Andrew Dolchok robbed and killed an Anchorage cab driver. Dolchok was indicted for first degree murder. Judge Moody presided over Dolchok's trial. Dolchok's attorney for this trial was R. Collin Middleton.

Dolchok's defense was insanity under AS 12.45.083. Both the prosecutor and Dolchok's defense attorney thought that he should be found not guilty because of insanity ("NGI"). They mutually arrived at an understanding as to how the case should be tried.[1] The defense attorney, to ease the prosecution's case, would not raise suppression issues with respect to Dolchok's confession, effectively stipulating to the facts of the offense. The prosecutor agreed not to argue for a guilty verdict rather than an NGI. They both agreed that the matter should be tried before a judge, not a jury.

An off-the-record in-chambers conference was held between defense counsel, the prosecutor, and Judge Moody to arrange the court trial.[2] Dolchok was not present. Judge Moody agreed to try the case without a jury.[3]

Prior to trial Judge Moody held a competency hearing at which Dr. Langdon, a psychiatrist, testified that Dolchok understood the nature of the charges against him and could assist his attorney in his defense "if he wanted to." Dr. Langdon also testified to his belief that Dolchok's trial attorney could tell if Dolchok was "voluntarily not cooperating with him or delusionally not cooperating with him." On the basis of that testimony and a written report by a second psychiatrist, Dr. Rader, Judge Moody found Dolchok competent to stand trial.

Immediately following the competency hearing, in a discussion concerning scheduling for the trial, Judge Moody questioned both Dolchok and the trial attorney regarding Dolchok's planned waiver of a jury.[4]

---

1. The testimony concerning this agreement was elicited at the post-conviction remedy hearing held later. Although the state initially objected to characterization of this arrangement as an "agreement," both the defense attorney and the prosecutor referred to it as such. It appears that the prosecutor was hesitant to use the term "agreement" in that he wanted to make it clear that there was no personal commitment from Judge Moody that an NGI was appropriate.

Apparently Dolchok's case was one of several so-called "walk-through insanity" cases in which the prosecution and defense agreed that an NGI was the most appropriate result. The prosecutor's testimony termed this an "orchestrated presentation of facts to a pre-determined result." Apparently there were at least two categories of these "walk-throughs": those in which the trial judge had given some preliminary indication that, were the evidence to be in conformity with counsels' predictions, he would probably return an NGI verdict; and those cases in which no preliminary assessment was forthcoming from the trial judge. Dolchok's case undisputedly fell into the latter category.

2. The participants all testified at a hearing for post-conviction relief in 1976, but they remembered the contents of the discussion held only vaguely. Since the date of that conference we have cautioned trial judges to conduct proceedings on the record. *State v. Buckalew*, 561 P.2d 289 (Alaska 1977). We repeat that admonition here, and note that many of the difficulties in reviewing the asserted effects of the in-chambers conference on Middleton's state of mind, and, thus, indirectly on Dolchok's state of mind, could have been avoided if there were a complete record of that conference available for review.

3. At the time of the conference and the first trial, a defendant relying on an insanity defense could not waive a jury without the consent of the state and the court. This rule has since been changed. *See* Alaska R.Crim.P. 23(a); AS 12.45.083(d); ch. 119, § 7, SLA 1972.

4. The discussion proceeded as follows:
 DEFENSE COUNSEL: It should be in writing, Your Honor, and I will . . . .
 THE COURT: Would you do that and then we'll take it up, question him Wednesday or

Two days later Judge Moody again questioned Dolchok regarding his stated desire to waive trial by jury.[5] At the conclusion of this further inquiry the superior court accepted Dolchok's waiver of trial by jury.

At the trial the state called only one witness, Sergeant Church, the trooper who had arrested Dolchok and had taken Dolchok's confession.[6] Dolchok's confession was introduced without objection by Dolchok, in order to establish that Dolchok had killed the cab driver. The parties then proceeded to the "sanity" phase of the trial.

At the conclusion of the state's direct examination of Church, Dolchok's attorney requested a continuance so that the psychiatrists could have time to examine police reports which had not been made available to them previously, and because defense counsel was uneasy about Dolchok's "continuing competence to stand trial." He therefore requested that Dolchok be re-examined in late August before trial was to resume. The continuance was granted and the further psychiatric examination was ordered and performed. Trial then resumed and at the outset Dr. Langdon testified that he still thought Dolchok was competent. Dolchok's attorney concurred in that evaluation.

The defense called two psychiatric witnesses, Drs. Langdon and Burke. Dr. Langdon testified that Dolchok was insane at the time that he killed the cab driver, more

do you want to put the question now, if it's been discussed with him? Mr. Dolchok, you've heard your attorney say that you want to waive a jury trial. Do you understand you are entitled to a jury trial in the court and no one else can require you to give up that right?

MR. DOLCHOK: Yes.

THE COURT: And you are willing to waive a jury trial?

MR. DOLCHOK: Yes.

THE COURT: And let myself—are you agreed that I may try it and let myself try it? Are you willing to do that?

MR. DOLCHOK: Yes.

THE COURT: Will you speak up so we hear . . . .

MR. DOLCHOK: Yes.

THE COURT: Do you think he understands that?

MR. MIDDLETON: Yes.

THE COURT: Any question in your mind that he does?

DEFENSE COUNSEL: No, Your Honor, none at all.

THE COURT: All right. Then will you get this signed though and . . . .

DEFENSE COUNSEL: I'll have the necessary waiver (indiscernible).

THE COURT: All right . . . .

5. That discussion proceeded as follows:

THE COURT: This is the time set for further proceeding in 71–217, State versus Dolchok. I have before me what purports to be a waiver of trial by jury signed by Mr. Dolchok and [defense counsel] and the district attorney, approval by the—consent by the district attorney. Mr. Dolchok, have you seen this waiver of trial by jury?

MR. DOLCHOK: Yes.

THE COURT: And is that your signature on that?

MR. DOLCHOK: Yes.

THE COURT: And you've discussed your right to a trial by jury and the fact that no one can require you to waive that right?

MR. DOLCHOK: Yes.

THE COURT: And you understand you may waive it if you desire? And you desire to waive trial by jury?

MR. DOLCHOK: Yes.

THE COURT: [Defense counsel], any question in his mind he understands his rights?

DEFENSE COUNSEL: I believe he understands his right to a trial by jury and waives it.

THE COURT: All right. The court will accept the waiver then with the approval of the district attorney.

6. After the cab driver was killed, composite sketches of the suspect were made from descriptions given by people who had seen Dolchok getting into the cab. These composites were published in the Anchorage and Fairbanks papers. Officer McClung of the Fairbanks police recognized Dolchok, who was by then in the Fairbanks jail on other charges. Dolchok's clothing was searched and yielded a pair of prescription sunglasses that had belonged to the cab driver. The investigators also located a trail of other evidence linking Dolchok to the killing. A special grand jury returned an indictment for murder on July 20, 1971, and on the same day, Church went to Fairbanks, arrested Dolchok on the murder charge, and took Dolchok to Anchorage by plane. Upon arriving in Anchorage, Dolchok agreed to confess and dictated his confession to Church while Church typed it. The confession contained not only a description of the killing itself but also a recitation of Dolchok's activities before and after the killing.

particularly, that while he was able to appreciate the wrongfulness of his act, he could not conform his conduct to the requirements of the law. Dr. Burke testified that Dolchok was suffering from a major mental illness, chronic and long-standing.

Judge Moody found Dolchok guilty of first degree murder. After weighing the psychiatric testimony in conjunction with the lengthy narrative in Dolchok's confession of his activities before and after the murder, Judge Moody concluded that Dolchok had been able to appreciate the wrongfulness of his act and had been able to conform his conduct to the requirements of law.[7] Dolchok was sentenced to life imprisonment. This court affirmed the conviction in *Dolchok v. State*, 519 P.2d 457 (Alaska 1974), implicitly holding that Judge

Moody was not barred by the uniform psychiatric testimony and that the ancillary factual matters in Dolchok's confession provided a sufficient evidentiary basis for Judge Moody's conclusion that Dolchok was sane.[8]

### 2. Post-conviction relief hearing.

After his conviction and imprisonment, Dolchok filed a *pro se* "motion to vacate judgment" in this court, which we referred to the superior court as a motion for post-conviction relief under Criminal Rule 35(c).[9] This was assigned to Judge James K. Singleton, who conducted the PCR hearing.[10] Dolchok, represented by a new attorney, raised issues involving the in-chambers conference at which the prosecutor and Dolchok's trial attorney revealed to Judge

---

**7.** AS 12.45.083(a), which adopts the ALI test for insanity, provides:

> (a) A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

*See also* note 14 *infra*.

In finding Dolchok sane and thus responsible at the time of the killing, Judge Moody relied in part on certain "peripheral" statements in Dolchok's confession about his behavior before and after he killed the cab driver, concluding that a person who had maintained control through the events of the preceding and subsequent time periods would not suddenly "run out of stops" and equally suddenly regain control, leaving a "gap" just long enough to kill and rob the cab driver while out of control. Rather, Judge Moody decided that a reasonable person could only conclude, after hearing the entire sequence of events, that killing the cab driver was just as "rational" as the rest of the acts that Dolchok described in his confession (attempting to obtain drinks or a prostitute or another cab ride without money, with no violent reactions to frustrations of all those attempts, and an extended spree of drinking and crime before and after the killing) and that Dolchok was sane at the time of the killing and thus guilty of murder.

**8.** In affirming Dolchok's conviction in *Dolchok v. State*, 519 P.2d 457 (Alaska 1974), this court held that the evidence Judge Moody relied on in reaching his verdict was sufficient to support the verdict. In so holding, we said:

> It could be reasonably inferred from these statements that appellant knew what he was doing and that it was wrong, but that he had no feeling for the wrongfulness of his act because he was amoral. It was not the purpose of the statute governing insanity in criminal cases to exculpate from criminal responsibility those persons who, because they lack ethical sense, engage in criminal conduct. Such a lack of acceptance of basic moral concepts is not the equivalent of an inability, as a result of mental disease or defect, to conform one's conduct to the requirements of law.
>
> When viewed in this light, the detailed series of events as shown by the evidentiary context of the killing, particularly as related by appellant, points to a man who, although mentally disturbed, had substantial capacity to control his behavior. This conclusion is confirmed by logical inferences arising from the testimony of Dr. Langdon. In these circumstances we find substantial evidence to support the conclusion of the trial judge that there was no reasonable doubt that appellant, despite his mental illness, was substantially capable of appreciating the wrongfulness of his conduct and conforming his conduct to the requirements of law.

*Id.* at 461.

**9.** The section of Criminal Rule 35 formerly denominated section (b) was redesignated as section (c) pursuant to Supreme Court Order 426, dated August 1, 1980.

**10.** Normally, a petition for post-conviction relief is assigned to the judge who presided over the original proceedings. It is unclear from the record whether the assignment to Judge Singleton was the result of a calendaring error or of a peremptory challenge by Dolchok.

Moody their intention to try the case without a jury; Dolchok's competence at the time of his trial to waive his right to a jury as well as his rights to testify and to cross-examine witnesses; the voluntariness of Dolchok's confession; Dolchok's waivers of his *Miranda* rights; and alleged ineffective assistance of counsel.

Judge Singleton denied relief on all but one issue. He found that because of Dolchok's defense attorney's misapprehension of the effect of the uniform psychiatric evidence,[11] Dolchok missed an opportunity to challenge the truth of some of the "peripheral" statements in Dolchok's confession upon which Judge Moody had relied in making his determination concerning Dolchok's sanity. Judge Singleton therefore ordered a "partial reopening of the evidence" before Judge Moody to determine the truth of those disputed statements in Dolchok's confession. If, and only if, Judge Moody were to find one or more of those statements to be false, Judge Moody was to consider the effect of their falsity upon his ruling regarding Dolchok's sanity.

### 3. *Partial new trial.*

The partial new trial was assigned to Judge Moody, who had presided over the original trial. Dolchok preliminarily attempted to challenge Judge Moody both peremptorily and for cause, unsuccessfully on both.

At the partial new trial, Dolchok took the position that the state continued to be bound by the agreement made between the original prosecutor and the original defense attorney, so that the state could not contest a verdict of NGI. Judge Moody rejected this argument, apparently assuming that Judge Singleton had already ruled against it. Based on the contention that the state could not renege on its original agreement,

Dolchok refused to take the stand unless the state would agree not to cross-examine him as part of its general commitment not to contest an NGI verdict. Dolchok's new attorney asked Judge Moody either to take judicial notice of the post-conviction relief proceedings or to allow him to present independent evidence of the original prosecutor-defense agreement in support of his position. Judge Moody refused.

The partial new trial was heard at various times from June, 1978, to December, 1978, during which Judge Moody heard the testimony of over twenty-five witnesses. At the conclusion of the partial new trial, Judge Moody entered findings of fact and conclusions of law. He found, in part, that a sufficient number of the factual statements in Dolchok's confession had been independently corroborated to justify his conclusion that all essential elements of the confession were trustworthy. He noted that Dolchok "offered no direct evidence which placed any of the factual statements of the confession in question." Judge Moody concluded that "[n]o evidence adduced has affected this court's original finding that Andrew Dolchok was sane at the time of the commission of the offense."

Dolchok has appealed from Judge Singleton's order denying relief on all issues except the truthfulness of certain statements in his confession. He has also appealed from the result of the partial new trial before Judge Moody. Those appeals have been consolidated.

### B. *Issues.*

■ In the proceeding for post-conviction relief, Dolchok had the burden of establishing by a preponderance of the evidence those facts which would entitle him to relief. *See Hensel v. State*, 604 P.2d 222 (Alaska 1979). Our review of the trial

---

11. Dolchok's defense counsel believed that if the judge in a court trial was presented with psychiatric evidence which uniformly indicated that Dolchok had been insane when he killed the cab driver, then the judge would be legally bound by that evidence to find that Dolchok had been insane at the time of the killing. Judge Moody explicitly held that he was not bound to decide in accordance with the psychiatric testimony "if it is based on facts not supported by the evidence, or [the psychiatrists'] reasons are unsound." He then rejected the medical testimony and decided that Dolchok had been capable of controlling his conduct and thus was sane under the ALI standard at the time of the killing.

judge's factual findings is limited to determining whether they are clearly erroneous. *Merrill v. State*, 457 P.2d 231, 233–34 (Alaska 1969).

Dolchok has raised several issues in his appeal from Judge Singleton's order on the post-conviction relief proceedings. He argues first that Judge Singleton incorrectly decided that Dolchok's absence from the in-chambers conference with Judge Moody in violation of the Alaskan Criminal Rules was harmless error; Dolchok insists that his absence violated his rights to jury trial, to confrontation and cross-examination, to call witnesses, to testify on his own behalf, and to counsel, and the privilege against self-incrimination. Second, Dolchok argues that his waiver of jury trial was invalid, on several grounds: that he was without sufficient knowledge of the mechanism of jury trials to make a knowing waiver; that the waiver was induced by a false guarantee of an NGI in return for the waiver; and that he was mentally incompetent to make such a waiver at all. Third, he argues that it was improper for Judge Singleton to make a retroactive determination of Dolchok's competence to waive his right to jury trial, his right to counsel, and his privilege against self-incrimination. Fourth, he argues that he was denied effective assistance of counsel. Fifth, he argues that the confession was taken in violation of his right to counsel, his privilege against self-incrimination, and the priest-penitent privilege. Sixth, he argues that Judge Singleton erred in failing to grant him a jury trial once a partial new trial had been ordered.

Dolchok has raised additional issues concerning the partial new trial. Principally, Dolchok argues that the state refused to consider itself bound by the original agreement between defense counsel and prosecution at the original trial. He further contends that Judge Moody confused the distinction between the post-conviction remedy proceedings and the partial new trial of the criminal proceedings, and that certain

of Judge Moody's rulings violated the double jeopardy clause of the Constitution.

We conclude that Dolchok's claims are without merit.

### C. The In-Chambers Conference.

■ The first contention of Dolchok's that we address is his argument that his absence from the in-chambers conference held before the initial trial, at which Judge Moody, the prosecutor, and Dolchok's original defense attorney were present, violated his constitutional rights. He argues that the in-chambers conference was a critical stage of the criminal proceedings, at which the participants discussed the merits of the evidence; and that the error was not harmless, in that his mistaken understanding of what went on at that in-chambers conference was what misled him into waiving his right to jury trial—*i.e.*, Dolchok thought that he was waiving his jury right in return for a "guaranteed" NGI promise from the judge, and that had he attended the conference, he would have realized that this was not the case.

Under both the United States Constitution and the Alaska Constitution the right of the defendant to be present at every stage of the trial has been recognized. Under the federal Constitution, the United States Supreme Court has based this right on the confrontation clause of the Sixth Amendment and on the due process clause of the Fifth and Fourteenth Amendments. *See Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353, 356 (1970); *Dowdell v. United States*, 221 U.S. 325, 331, 31 S.Ct. 590, 592, 55 L.Ed. 753, 757 (1911). In Alaska, this right is also grounded in the parallel provisions of Alaska Constitution art. 1, § 7 (due process) and § 11 (confrontation). *See Dixon v. State*, 605 P.2d 882, 884 n.3 (Alaska 1980).

Two Alaskan Criminal Rules have further implemented this right.[12] Criminal Rule 38(a) provides:

---

**12.** Criminal Rule 16(f), which impliedly requires the accused's presence at the omnibus hearing, is not implicated here.

*Presence Required.* The defendant shall be present at the arraignment, at the preliminary hearing, at the time of plea, at the omnibus hearing, and at every stage of the trial, including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided in this rule.

Criminal Rule 22(a) provides:

At any time after the return of the indictment or the filing of the information the court upon motion of any party or upon its own motion may invite the attorneys to appear before it for a conference in open court, at which the defendant shall have the right to be present, to consider:

(1) The simplification of the issues;

(2) The possibility of obtaining admissions of fact and documents which will avoid unnecessary proof;

(3) The number of expert witnesses or character witnesses or other witnesses who are to give testimony of a cumulative nature;

(4) Such other matters as may aid in the disposition of the proceeding.[13]

We have further held that the right to be present can be waived, but only by the methods outlined in *Lee v. State,* 509 P.2d 1088 (Alaska 1973). Judge Singleton found, correctly, that no such waiver had occurred here.

Judge Singleton concluded that the failure to have Dolchok attend the in-chambers conference was error, but that it had been harmless beyond a reasonable doubt. Relying heavily on *United States v. Gregorio,* 497 F.2d 1253 (4th Cir.), *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974), Judge Singleton found that the in-chambers discussion had been limited to purely legal and procedural questions, and that there was no indication that Dolchok's presence would have aided in his defense.

The testimony at the post-conviction relief hearing of the three participants in the in-chambers conference was vague, but not inconsistent. Apparently the major purpose of the conference was to secure Judge Moody's approval of the decision to waive a jury trial and the parties' stipulation to use the American Law Institute (ALI) insanity standard.[14] The prosecutor's testimony was that he probably told Judge Moody that they expected the trial to be "more or less . . . truncated"; that certain stipulations would be made by the defendant; and that they expected the principal thrust to be the psychiatric phase. He was also fairly certain that he told Judge Moody that the psychiatric evidence would be "uniform" to the effect that Dolchok had not been responsible at the time of the murder. Dolchok's defense attorney's testimony was that it was probable that Judge Moody was told that the state had a strong case against Dolchok on the merits. Judge Moody testified that the insanity issue was raised at the conference, but that he could not recollect mention of any agreement between the state and the defense about ensuring an NGI verdict. The testimony of all three was consistent that there was no attempt to get Judge Moody to commit himself to a predetermined verdict, and that he gave the two attorneys no indication whether his evaluation of the psychiatric evidence would be the same as theirs.

We think Judge Singleton responded correctly to Dolchok's argument on this point. His analysis was supported by federal precedent:

The [federal] courts have ordinarily allowed convictions to stand despite defendant's absence from [in-chambers] conferences, reasoning either that this kind of conference is not a stage of the

---

13. In this respect, our Criminal Rule 22 differs from Fed.R.Crim.P. 17.1, which is silent on the question of an accused's presence. *See* 8 J. Moore, Moore's Federal Practice ¶ 17.1.03[4] (1980).

14. At the time of Dolchok's original trial, Alaska had not yet adopted the ALI test for insanity

defenses, although there was mounting anticipation that it would. Thus, the law was unclear. Shortly after Dolchok's trial, it became clear that the ALI test used in his trial was the correct one. *See Schade v. State,* 512 P.2d 907, 911–12 (Alaska 1973).

trial, within the meaning of the rule, or that clearly defendant was not prejudiced since only legal matters were discussed and his counsel was there to speak for him.

3 C. Wright, *Federal Practice and Procedure* § 721, at 195 (1969) (footnote omitted).[15] We have previously held that a defendant's absence from several anteroom conferences held during a criminal trial did not rise to the level of plain error. *Kugzruk v. State*, 436 P.2d 962 (Alaska 1968).[16]

We agree with Judge Singleton that Dolchok's absence was harmless error. Dolchok does not contend that anything he would have said at the conference would have affected Judge Moody's view of the case. Rather, Dolchok's main argument is that he was under the mistaken impression that he had a "guaranteed" NGI verdict, and that, had he attended the in-chambers conference, he would have realized that the

NGI verdict was not guaranteed by the judge. From the record, however, it appears that Judge Moody neither endorsed nor criticized the arrangement between defense and prosecution of which he was informed at the conference,[17] and thus it is mere speculation to presume that Dolchok would have reached that conclusion. Further, his defense attorney's mistaken assessment of the case was not due to the attorney's perceptions of Judge Moody's attitude, but rather to his conclusion that the judge would be bound as a matter of law by the mutual agreement on an NGI verdict by the defense and prosecution.[18] Thus, even had Dolchok attended the conference and directly requested a guarantee from Judge Moody, and had that request denied, he still would have been assured by his defense attorney that the NGI was inevitable. Under these circumstances, we think that Dolchok's failure to attend the conference was harmless beyond a reasonable doubt.[19]

**15.** In 1975 federal Rule 43 was amended to provide that the "defendant need not be present ... at a conference or argument upon a question of law." Fed.R.Crim.P. 43(c)(3). Prior to the amendment the rule did not address the defendant's right to be present at proceedings held in-chambers in the absence of the jury. The change in the text of the rule does not undermine the result reached by Judge Singleton. If anything, it supports it.

**16.** We think that the preferable practice would be to inform defendants (on the record, if practicable) of their opportunity to attend in-chambers conferences, unless there is some meritorious reason for disallowing such attendance (which should be affirmatively stated on the record).

**17.** The testimony was uniform on this point. Dolchok's defense attorney testified that "I did not get, from Judge Moody—as far as I can recall, a—an indication that he would buy it or that it was okay with him. He didn't say that. He didn't say that's fine, fellas, we're all set. He also did not say it's not fine. . . . I mean he certainly had not bound himself when we were in—in the office with him . . . ." The prosecutor agreed, "No, if he would have come right out and said, you guys are wrong and from what you've told me—you know, a definite, absolute statement, no, he certainly—I'm sure he didn't make that."

**18.** The defense attorney testified, "I mean he certainly had not bound himself when we were

in—in the office with him, but whether I would have said it to [Dolchok], I don't know because I don't know how much—I felt he was independent 'cause I kind of felt he was going to be bound by the evidence that we are going to present which was going to be all one way and he was going to be bound by what [the prosecutor] was going to say, and did say, which was I think he's crazy too."

**19.** Judge Singleton found that the error was harmless beyond a reasonable doubt, utilizing the standard for constitutional error. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967). Since the failure to have Dolchok attend the in-chambers conference was clearly in violation of the Criminal Rules, and only arguably a constitutional violation, it might suffice to assess the error under the less stringent standard of *Love v. State*, 457 P.2d 622 (Alaska 1969):

"[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, [then the error was not harmless]."

*Id.* at 631, *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946).

Since we find the error was harmless under either standard, the question is academic. Although we have held that violations of Criminal Rule 38 must meet the stricter constitutional standard of harmless error, *Meyer v. State*, 627

### D. *Waiver of Jury Trial.*

Dolchok next argues that his waiver of jury trial and other rights [20] was invalid.

We have emphasized that "[t]rial by jury is a fundamental right accorded criminal defendants, and, as such, it requires a knowing and intelligent waiver for relinquishment." *Walker v. State*, 578 P.2d 1388, 1389 (Alaska 1978) (footnotes omitted). We have further added the requirement that the court personally address the defendant, failure to do so being error per se. *Id.* at 1389–90.

The record shows that Judge Moody did directly question Dolchok as to his waiver of the jury trial, and further specifically inquired of Dolchok's defense attorney if there was "any question" in the attorney's mind about whether Dolchok understood his rights.[21] This clearly fulfills the requirements of *Walker*. Dolchok argues, however, that his waiver was "unknowing" in several respects and therefore invalid. He puts forward three arguments: first, that he was insufficiently informed of the "mechanism" of a jury trial to make a knowing waiver; second, that his waiver was based upon the mistaken premise that he had a guaranteed NGI verdict; and third, that he was not competent to make a knowing waiver of rights. We address these contentions seriatim.

### 1. *Insufficient knowledge of the "mechanism" of a jury trial.*

Dolchok's contention here is that since his original defense attorney was virtually certain that an NGI verdict would eventuate, he did not adequately explain the advantages and disadvantages of a jury, the procedure by which jurors are chosen, and such. Dolchok relies on testimony by

the defense attorney at the subsequent post-conviction remedy hearing to the effect that the defense attorney could not specifically remember giving Dolchok some definition of what a jury trial was; testimony by Dr. Rader that he never ascertained whether Dolchok understood what a jury trial was; and testimony by Dolchok himself that he did not understand his right to a jury trial at the time he waived it, and that his attorney misled the court in indicating that Dolchok did understand his right.

Judge Singleton concluded that Dolchok did understand that he had a right to a jury trial, and that there were advantages to waiving it regarding enhancing the likelihood of the anticipated NGI verdict. These factual findings will not be overturned by this court unless they are found to be clearly erroneous. *Merrill v. State*, 457 P.2d 231, 233–34 (Alaska 1969).

We cannot say that these findings were clearly erroneous. Dolchok did respond affirmatively when asked whether his defense attorney had explained that he would be better off with a judge because an NGI would then be more likely. The defense attorney testified that he would not have represented to Judge Moody that Dolchok understood his rights unless he had previously explained them to Dolchok, and further that his custom and practice was to explain what a jury was and the advantages of using it and waiving it.

Given the evidence going to this issue, we cannot say that Judge Singleton was clearly erroneous in concluding that Dolchok failed to carry his burden of proving by a preponderance that he did not have a sufficient understanding of the advantages and disadvantages of a jury trial.

P.2d 636, 639 (Alaska 1981); *State v. Hannagan*, 559 P.2d 1059, 1065 (Alaska 1977), we decline to hold that the same beyond a reasonable doubt standards must be applied to violations of Rule 22. As noted in *Meyer*, Rule 38 protects a right of "constitutional dimension." 627 P.2d at 639. We do not mean to decide that Dolchok's absence from the in-chambers conference rose to the level of a constitutional violation.

**20.** Specifically, Dolchok applies the competence arguments herein not only to his waiver of jury trial, but also to his waivers of his Fifth and Sixth Amendment rights in giving his confession and in conducting his trial.

**21.** *See* notes 4 and 5 *supra*.

### 2. *The illusory guarantee of an NGI.*

■ Dolchok next argues that his waiver of jury trial was invalid because it was induced by his being misled by an illusory guarantee of an NGI verdict.

From the record, it is apparent that Dolchok's defense attorney and the prosecutor agreed that the appropriate verdict would be an NGI, and that both sides intended to present their cases toward that end. It is also clear that Dolchok's defense attorney believed that this congruence of presentations by the two sides would bind Judge Moody as a matter of law to a finding that Dolchok was NGI.

Judge Singleton, although he did not address this argument explicitly, implicitly rejected it in finding that the waiver of jury trial was knowing and voluntary.

The state argues that the waiver of jury trial was not premised on a guarantee of an NGI, but rather was a ·tactical decision made by Dolchok and his trial attorney, and thus cannot be invalidated on this ground. In support, the state points to Dolchok's affirmative responses when asked whether he understood that the jury right had been waived in order to make an NGI verdict more likely; and to the testimony of Dr. Rader, an examining psychiatrist, who stated that Dolchok understood that it was tactically advantageous to waive the jury.

We think that the situation presented here with respect to a jury waiver as part of a "walk-through" NGI verdict is analogous to the arrangements made in a plea bargaining context, and that the law applicable to the latter cases is relevant in analyzing the case before us. "Walk-through" cases are dissimilar to some plea bargaining cases, in that the agreement reached between the defense and prosecution must always be played out at trial. In most situations it would be inappropriate for the court to commit itself to going along with the agreement before trial, although this would be an ordinary occurrence in the plea bargaining context. The typical "walk-through" case, therefore, involves an arrangement binding the defendant and the state, but not the court. It is to the particular facet of plea bargaining law involving similar agreements, *i.e.*, those binding the parties but not the bench, that our inquiry must reach.[22]

Prefatory to this discussion, we note that the Alaska Attorney General's office has, since 1975, barred "plea bargaining" on the part of the state.[23] Although there are differing views on the advisability of plea bargaining as a matter of policy,[24] it is not the role of courts to make a pronouncement one way or the other. Thus, this opinion should not be read as a value judgment on either plea bargaining or "walk-through NGI" proceedings; it is the court's function to explicate the applicable law. One additional caution is appropriate. The following discussion (pages 287–290 *infra*) is not meant to be exclusively a description of Alaskan plea bargaining law. We have included a survey of the approaches used in other jurisdictions and consult this precedent for its persuasive value in the "walk-through" setting, but do not mean to imply that we are adopting it as Alaska's plea bargaining law. In short, the analysis employed here is intended to be limited to "walk-through" situations.

■ The general rule is that an accused who has entered a plea of guilty is not entitled to withdraw the plea as a matter of right. *Everett v. United States*, 336 F.2d 979 (D.C.Cir.1964). Alaska Criminal Rule 11(h) allows a defendant to withdraw a guilty plea only when he "proves that withdrawal is necessary to correct manifest

---

**22.** For a useful treatment of this general subject, see Annot., 66 A.L.R.3d 902 (1975).

**23.** *See State v. Carlson*, 555 P.2d 269, 273 n.4 (Alaska 1976) (Rabinowitz, J., concurring).

**24.** For the view that plea bargaining is an acceptable and even salutary method of disposing of criminal charges, see *Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427, 432 (1971); III ABA Standards for Criminal Justice 14–4 to 15–5 (introduction to ch. 14, Pleas of Guilty) (2d ed. 1980). We do not, by citing these, intend any criticism of the Attorney General's policy judgment that plea bargaining should be prohibited in Alaska.

injustice." *See Winkler v. State*, 580 P.2d 1167, 1168–69 (Alaska 1978). Since pleas of guilty constitute waivers of constitutional rights, however, they "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970). Alaska R.Crim.P. 11(c) and (d) require the trial court to determine that a plea is voluntary, that the defendant understands the nature of the charge, and to inform the defendant of the consequences of a plea. *See Else v. State*, 555 P.2d 1210 (Alaska 1976); *McKinnon v. State*, 526 P.2d 18 (Alaska 1974); *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974).

A plea of guilty induced by plea bargaining was of uncertain status under the early case of *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), which held that a waiver of the Fifth Amendment privilege against self-incrimination must be "free and voluntary; that is, must not be . . . obtained by any direct or implied promises, however slight." *Id.* at 542, 18 S.Ct. at 186, 42 L.Ed. at 573. The Supreme Court in *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), made it clear that a guilty plea influenced by an opportunity or promise of leniency was not inconsistent with the Fifth Amendment; in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the Supreme Court went even further, noting several reasons why disposition of charges based upon plea discussions might be "highly desirable." *Id.* at 261, 92 S.Ct. at 498, 30 L.Ed.2d at 432.

When the plea bargain goes forward as anticipated, *i.e.*, the accused receives the concession expected as part of the arrangement, generally the terms of the bargain itself can not be asserted as a basis for a withdrawal of the plea. The problem arises when the anticipated concessions are not received. The inquiry must focus on precisely what arrangements were agreed to by the prosecutor, defense counsel, and sentencing judge, and on what the defendant was told concerning the agreement.

Prosecutors often make concessions in return for guilty pleas. When this is the case, the prosecutorial promise must be fulfilled, or else the plea may be withdrawn. *Santobello v. New York*, 404 U.S. 257, 262–63, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427, 433 (1971). *See also Padie v. State*, 594 P.2d 50, 58 (Alaska 1979) ("failure to abide by a condition of the plea renders it invalid"); *Cooksey v. State*, 524 P.2d 1251, 1256 (Alaska 1974) (if plea entered subject to condition approved by prosecutor, "the failure of the judicial system to respect that express condition would likely render the . . . plea unintelligent and invalid."). Generally, a prosecutor can promise to accept a plea to a lesser charge, to dismiss certain charges, or to give a particular sentence recommendation. *See* Alaska R.Crim.P. 11(e)(1). Where the court chooses to disregard that recommendation and impose a heavier sentence, an accused has no claim that the prosecutor has failed to keep the promise. In this latter situation, courts of other jurisdictions are split as to whether or not a motion to withdraw the plea should be allowed. *See United States ex rel. Culbreath v. Rundle*, 466 F.2d 730 (3d Cir. 1972) (if judge ultimately determines that the interest of justice would not be served by accepting the prosecutor's recommendation made as part of plea bargain, defendant should be allowed to withdraw plea, at least if the government claims no prejudice or harm); *State v. Ramos*, 512 P.2d 1274 (N.M. 1973) (no denial of due process where trial court's sentence exceeded prosecutor's recommendations pursuant to plea bargain). *See also State v. Gumienny*, 568 P.2d 1194, 1197 (Hawaii 1977) (noting split of authority).

The role of the trial judge is of paramount importance in this area. If the trial judge actually participates in, or approves of, the plea bargain,[25] then it is clear

---

**25.** In *State v. Buckalew*, 561 P.2d 289 (Alaska 1977), we held that Alaska's trial judges should

be barred from playing the role of a negotiator in either charge or sentence bargaining. We

that the accused must be given an opportunity to withdraw the plea if the trial judge subsequently refuses to grant the concession involved in the bargain. *State v. Williams*, 489 P.2d 231 (Ariz.1971); *People v. Delles*, 69 Cal.2d 906, 73 Cal.Rptr. 389, 447 P.2d 629 (Cal.1968); *Barker v. State*, 259 So.2d 200 (Fla.App.1972). Conversely, if the trial judge clearly informs the defendant, prior to accepting the plea, that he is not bound by the terms of any agreement between defense counsel and the prosecutor, then the plea is made with knowledge that the anticipated sentence may not be forthcoming, and the defendant is not entitled to withdraw the plea.[26] *Miles v. Parratt*, 543 F.2d 638 (8th Cir. 1976); *State v. Cagnina*, 113 Ariz. 387, 555 P.2d 345 (1976); *Szarwak v. Warden*, 167 Conn. 10, 355 A.2d 49 (1974); *State v. Adams*, 342 So.2d 818 (Fla.1977); *People v. Davis*, 74 Mich.App. 624, 254 N.W.2d 335 (1977).

When the trial judge is silent, neither endorsing the plea agreement nor informing the defendant that the court is not bound, a less clear case is presented.[27] There is some modern authority which finds that the judge has an affirmative obligation to explain to the defendant that he is not bound by the plea agreement, and that the failure to fulfill this obligation requires that the accused be allowed to withdraw his plea if the actual sentence exceeds the recommendation for which he bargained. *See Quintana v. Robinson,* 31 Conn.Sup. 22, 319

A.2d 515 (1973); *State v. Runge,* 228 N.W.2d 35 (Iowa 1975). Obviously, where the trial court fails to explain the situation to the defendant, the statements of the prosecutor and defense counsel to the defendant become much more important.

The right of the defendant to withdraw his plea may turn, in part, on the nature of the statements made by the prosecutor, *i.e.*, how strongly those statements conveyed the impression to the accused that the actual sentence would follow the recommendation. Thus, where the prosecutor has indicated that he is promising a particular sentence, rather than a particular sentence recommendation, the guilty plea may be invalid. *People v. Savin*, 37 Cal.App.2d 105, 98 P.2d 773 (1940); *People v. Zuckerman*, 46 Ill.App.2d 210, 197 N.E.2d 136 (1964). Where the prosecutor has indicated that he will make a particular recommendation and has coupled that with an observation that the court should follow the recommendation, the courts are split. *Compare People v. Cassiday*, 90 Ill.App.2d 132, 232 N.E.2d 795 (1967) (withdrawal of plea allowed where prosecutor told accused court "usually followed" prosecutorial recommendation) *with Haver v. State*, 162 Ind.App. 93, 317 N.E.2d 884 (1974) (withdrawal disallowed where prosecutor told defendant that trial court "almost always" followed prosecutorial recommendation).

---

were careful to distinguish the situation presented there, in which the court had engaged directly in plea discussions with the defense leading to the entry of a guilty plea, from situations in which the trial court merely approves or disapproves of an agreement reached by the parties. *Id.* at 291 n.3. The latter situation is specifically contemplated by Criminal Rule 11.

We do not mean to imply any criticism of Judge Moody's actions in Dolchok's original trial. Obviously, the agreement there long antedated our decision in *Buckalew*; further, although it is unclear to what extent Judge Moody was aware that there was a defense-prosecution agreement, it is clear that he did not engage in any negotiations leading up to that agreement.

**26.** Both of these rules are implicit in our Criminal Rule 11, under which the trial judge before

whom a plea agreement is explained may either accept the agreement, in which case the sentence imposed cannot be more severe than that contemplated by the agreement, or else reject the agreement, inform the defendant in open court that the court is not bound by the agreement, and afford the defendant an opportunity to withdraw the guilty plea.

**27.** In Alaska, such silence by the trial judge is not permitted under Alaska R.Crim.P. 11 when a plea is entered by the defendant in the expectation that a specific sentence will be imposed or other charges before the court will be dropped. Rule 11(e)(2), (3), and (4). *See Padie v. State*, 594 P.2d 50, 58 (Alaska 1979) ("[T]he terms of any agreement must be disclosed on the record before the superior court may accept a . . . plea.").

The most difficult cases are presented when defense counsel has erroneously explained the bargain to the accused as being stronger than it actually is—*e.g.*, has represented to the accused that the court has promised a particular sentence, or overstated the concessions made by the prosecutor. Here, the modern trend seems to be that, if proved, such facts entitle the defendant to withdraw the guilty plea. *McAleney v. United States*, 539 F.2d 282 (1st Cir. 1976); *Santos v. Laurie*, 433 F.Supp. 195 (D.R.I. 1977); *Bryant v. State*, 355 So.2d 497 (Fla. App.1978); *State v. Rose*, 440 S.W.2d 441 (Mo.1969); *People v. Frederick*, 45 N.Y.2d 520, 410 N.Y.S.2d 555, 382 N.E.2d 1332 (1978); *Dube v. State*, 257 Ind. 398, 275 N.E.2d 7 (1971); *Ritter v. State*, 475 P.2d 407 (Okla.Crim.App.1970); *State v. Welch*, 112 R.I. 321, 309 A.2d 128 (1973).[28] The difficulty presented in this area is separating counsel's statements regarding the terms of the bargain from counsel's predictions regarding the outcome of particular tactical choices; both are integral parts of defense counsel's responsibility to his client.

We now apply these principles to this case, assessing the respective statements of judge, prosecutor, and defense counsel concerning the bargain and "guaranteed NGI."

It is unclear from the record whether Judge Moody was made aware of any "agreement" between Dolchok's defense attorney and the prosecutor at the in-chambers conference. It is clear that he did not convey to the attorneys any indication that he approved of any such agreement, or that he would acquiesce in it.[29] It is also clear that he did not personally inform Dolchok, either at the time of Dolchok's waiver of

jury trial or at any other time, that he would not be bound by whatever agreement Dolchok's attorney and the prosecutor had worked out.

We thus have the case of the "silent judge." We think it clear, however, that Dolchok's decision to waive jury trial was not based on any misconception that Judge Moody had committed himself to the agreement between the two attorneys. Dolchok referred to the agreement as one between his lawyer and the district attorney and testified that his defense attorney had not told him that there was a deal with the judge.

We also find insufficient support for the proposition that the prosecutor may have overstated the nature of the agreement in conversations with Dolchok. At the post-conviction relief hearing, Dolchok attempted to prompt both the prosecutor and the defense attorney to recall a series of alleged statements made by the prosecutor in Dolchok's presence—to the general effect that Dolchok should not worry, that everything would be all right, that he would keep the deal together, that Judge Moody was acting peculiarly and was not "following the script." The defense attorney testified that the prosecutor "could well have" made these statements; the prosecutor testified that he had no present recollection of having made them. Even if this scanty evidence met the required standard of a preponderance, *Hensel v. State*, 604 P.2d 222 (Alaska 1979), these statements do not constitute an assurance that the prosecutor's recommended disposition would be the one adopted by the court.

**28.** The Minnesota Supreme Court has held that, where an attorney advised a client that he could withdraw his plea if the court did not approve the sentence recommendation in the plea bargain, withdrawal of the plea should be allowed even if the trial court informed the defendant that it would not be bound by the recommendation. *State v. Loyd*, 291 Minn. 528, 190 N.W.2d 123 (1971).

**29.** The only point at which Judge Moody might have been informed of the agreement would be the in-chambers conference.

Judge Singleton found that the two attorneys met with Judge Moody primarily to procure his permission to conduct the trial (1) without a jury and (2) under the American Law Institute standard for insanity. *See* notes 3 and 14 *supra.* Judge Moody agreed to these proposals. Judge Singleton also found that the attorneys' evaluation of the merits of the case may have been discussed in general terms, but that both attorneys left the conference understanding that Judge Moody had not bound himself to decide the case in accordance with their evaluation.

The most difficult task is ascertaining the content of the conversations between Dolchok and his defense attorney. At two points in his testimony at the post-conviction relief hearing, the defense attorney stated that he felt he had given Dolchok a pretty solid "guarantee." This was not based upon a mistaken perception that Judge Moody had bound himself to an NGI verdict, as the attorney understood that the judge had not so limited himself; rather, the defense attorney, as well as the prosecutor, believed that the trial court would be bound as a matter of law by the uniformity of the psychiatric testimony.

As noted above, the difficulty in this area is distinguishing an attorney's flat guarantee of a particular result contemplated as a quid pro quo for a particular concession from an attorney's predictive judgment that a particular result is more likely as the result of a tactical move. Here, defense counsel's advice to Dolchok to waive the jury trial was apparently based upon three grounds: according to defense counsel's testimony, he thought, first, that as a matter of general tactics, an insanity defense stood a better chance in a judge trial than in a jury trial;[30] second, that the waiver of jury trial was part of an agreement with the prosecutor, which included a counter-waiver of jury trial by the prosecutor and a promise that the prosecutor would not fiercely contest the NGI verdict; and third, that, as a matter of law, the judge would be bound by the evidentiary record which would result from the prosecutorial agreement.

The first of these represents the kind of tactical advice which is inherent in all major legal decisions and which, if it proves in hindsight to have been erroneous, cannot be the basis for invalidating the plea. A solemn plea of guilty should not be set aside merely because the accused has not achieved an unwarranted hope, *Schwerm v. State*, 288 Minn. 488, 181 N.W.2d 867, 868 (Minn.1970), and we think the same logic applies to the waiver of jury trial here.

The second represents a bargain which, if breached, would justify invalidating the waiver. The prosecutor kept his side of the bargain during the original trial, however, and thus, the attorney's advice was not mistaken or misleading, and Dolchok's expectations were fulfilled.

The third basis for the attorney's advice is the most disturbing, in that it amounted, according to the attorney's recollection, to a "pretty solid guarantee." In the plea bargaining context, it has been held that in situations where the prosecutor has agreed only to recommend that the court grant some concession, but the accused's attorney has erroneously assured him that he would receive the concession, the guilty plea may be withdrawn.

However, it appears from Dolchok's own testimony that he perceived the waiver of jury trial to be a matter of tactics, not a matter of a guaranteed NGI from the judge. He testified that he had no recollection of his attorney's telling him that a judge would have to find him NGI; he also testified that he did remember his attorney explaining that it would be tactically advantageous to waive a jury trial. Coupled with his testimony that his defense attorney had not told him that there was a deal with the judge, this leads to the conclusion that Dolchok's understanding was that the NGI was not "guaranteed" in return for his jury waiver, but that its likelihood was enhanced as a result of the jury waiver.[31] This does not rise to the level of an assurance that the anticipated concession, the NGI verdict, would definitely be granted, and thus does not invalidate the waiver of jury trial.

---

**30.** Indeed, he testified that even if he had thought Judge Moody was not bound as a matter of law, he still would have advised Dolchok to waive the jury. Juries tended to be swayed by the emotional impact of the case, he felt, and less able to understand the elements of an insanity defense.

**31.** This conclusion was reached by Judge Singleton in his findings of fact: "[I]t appears that petitioner did understand that he had a right to a jury trial and that there were advantages to waiving it regarding enhancing the likelihood of a not guilty by reason of insanity verdict." Dolchok has not carried his burden of showing that this finding was clearly erroneous. *Merrill v. State*, 457 P.2d 231, 233–34 (Alaska 1969).

Although we do not find that the circumstances here warrant invalidation of the jury waiver, we do think it appropriate to encourage prosecutors, defense attorneys, and trial court judges to take steps in any future "walk-through" NGI cases to avoid the problems which have arisen here. Defense counsel must be sure to explain to the accused the advantages and disadvantages of pursuing the "walk-through" NGI course, including an explanation of what rights are being waived and what concessions are expected; counsel should further explain which of these concessions are definite and which are merely probable, *i.e.*, precisely what commitments have been made as part of the "walk-through."

We also think it would be beneficial to have the terms of any arrangement laid out on the record, in a manner similar to that required in the case of plea bargains by Criminal Rule 11(d) and portions of Rule 11(e). Specifically, we think that the first sentence of Rule 11(e)(2) is a useful guidepost for disclosure of the agreement in open court. We hesitate to endorse the application of the entire elaborate procedure outlined in Rule 11(e) in the "walk-through"

context, however, because it is impractical to expect the court to bind itself to the parties' agreement prior to trial.[32] Instead, the court should merely make sure that the details of any arrangement are set forth in the record, explain to the defendant that the court is not bound to enter an NGI verdict by any agreements between the defense and prosecution, and satisfy itself that the defendant understands the relevant elements of the arrangement, including which concessions are definite and which are not definite.[33]

### 3. *Retrospective determination of competence.*

■ Dolchok next argues that it was improper for Judge Singleton to make a retrospective determination of his competence to waive his right to a jury trial and other procedural rights (specifically, the Fifth and Sixth Amendment rights waived by Dolchok's confession, discussed *infra*); and, further, that the record does not support the conclusion that Dolchok was competent to waive these rights.

**32.** We note the procedures outlined in the Federal Rules of Criminal Procedure with respect to different types of plea arrangements. Rule 11(e)(1) categorizes these arrangements according to the kind of promise made by the government attorney. The government may agree to:

(A) move for dismissal of other charges; or

(B) make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; or

(C) agree that a specific sentence is the appropriate disposition of the case. The court shall not participate in any such discussions.

For agreements of type (A) or (C), the procedures to be followed by the trial court in accepting or rejecting the agreement are the same as those in Alaska R.Crim.P. 11. In contrast, federal Rule 11(e)(2) provides that "[i]f the agreement is [of type (B)], the court shall advise the defendant that if the court does not accept the recommendation or request the defendant nevertheless has no right to withdraw his plea." The Advisory Committee Notes the federal Rule 11 explains that "a type (B) agreement is distinguishable from the other in that it

involves only a recommendation or request not binding upon the court." 8 J. Moore, Moore's Federal Practice ¶ 11.01[5], at 11–19 (2d ed. 1981). We think that the "walk-through" situation presented in this case, in which the prosecution could fulfill its part of the bargain without eliciting a commitment from the trial judge, is analogous to the type (B) agreement recognized by the federal rules. It is desirable, in such circumstances, that the trial court be able to acknowledge the arrangement between the parties, and make it a part of the record, without being required to make a premature commitment regarding the eventual ruling on the case. In such cases the court should always explain to the defendant that it is not bound by the arrangement, but that the defendant will have no right to withdraw from the bargain.

**33.** As in the plea bargaining context, the trial judge should be careful not to enter the discussion of the "walk-through" agreement as a negotiator. *See State v. Buckalew*, 561 P.2d 289 (Alaska 1977). The judge's role should be restricted to that of bringing the agreement onto the record, and ensuring that the defendant understands the limits of its legal effect. *See* note 32 *supra*.

Dolchok's objection to the retrospective determination of competence is apparently based on *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), in which the Supreme Court concluded that such a retrospective determination could not be made satisfactorily, partially because expert witnesses would have to testify solely from information contained in the printed record. *Id.* at 387, 86 S.Ct. at 843, 15 L.Ed.2d at 823. Judge Singleton noted that *Pate* was distinguished by the Ninth Circuit in *Sieling v. Eyman*, 478 F.2d 211 (9th Cir. 1973), on the ground that in *Pate* the trial court had never inquired into the competency issue and thus there had not been any examination as to competency at that point, whereas in *Sieling* the issue had been raised, with expert examinations, reports, and testimony which could be sufficient for the trial court to make its competency determination. 478 F.2d at 215. Judge Singleton concluded that since Dolchok's competence to stand trial had been at issue before the initial trial court, with expert evidence assembled on the record, *Pate* did not preclude a retrospective determination of competence to waive rights.

Although we think Judge Singleton was correct in his reading of *Pate* and *Sieling*,

we affirm his decision on another ground. In *Sieling*, the Ninth Circuit adopted a "dual standard" test for competency, under which competency to make a waiver of constitutional rights is assessed under a stricter test than competency to stand trial.[34] Dolchok successfully urged Judge Singleton to apply the stricter *Sieling* test to determine his competence to waive his constitutional rights, which required the court to make an independent evaluation beyond merely relying on Judge Moody's determination that Dolchok was competent to stand trial. Since the superior court decision, we have noted our disinclination to adopt separate tests for determination of competence to plead (*i.e.*, to waive rights) and competency to stand trial. *Morgan v. State*, 582 P.2d 1017, 1021 n.11 (Alaska 1978). This means that it was unnecessary for Judge Singleton to make a retroactive determination of competency to waive rights, since that determination was implicit in Judge Moody's initial determination that Dolchok was competent to stand trial.

Since Dolchok is not contesting the initial determination of competency by Judge Moody, we think he has effectively conceded that he meets the test of competency to

**34.** The level of competence required to stand trial has been described as follows by this court:

> The defendant must have some minimum ability to provide his counsel with information necessary or relevant to his defense. He must also be able to understand the nature of the proceedings sufficiently to participate in certain decisions about the conduct of the defense. Some strategic choices must be the product of meaningful communication between the defendant and his counsel.

> But this does not mean that a defendant must possess any high degree of legal sophistication or intellectual prowess. In determining competency, the standard of judgment must be a relative one. Some comparison must be made between the apparent competency of the accused and the ability level of the average criminal defendant. That level of ability is often not great. Numerous persons are subjected to criminal prosecution, and properly so, even though they are of relatively low intelligence or are suffering from some significant emotional or physical impairment. Not every emotional flaw renders one incompetent to stand trial.

*Schade v. State*, 512 P.2d 907, 914 (Alaska 1973) (footnote omitted). The Ninth Circuit in *Sieling* held that:

> The clear implication, then, is that [a determination of competence to stand trial] is inadequate because it does not measure the defendant's capacity by a high enough standard. While the Court did not suggest a standard, it is reasonable to conclude from the Court's language that the degree of competency required to waive a constitutional right is that degree which enables him to make decisions of very serious import. Judge Hufstedler, in *Schoeller v. Dunbar*, 423 F.2d 1183, 1194 (9th Cir. 1970) has suggested the following standard: "A defendant is not competent to plead guilty if a mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea." We think this formulation is the appropriate one, for it requires a court to assess a defendant's competency with specific reference to the gravity of the decisions with which the defendant is faced.

478 F.2d at 214–15 (footnotes omitted).

waive his rights. Even if he were arguing that Judge Singleton's finding of competency to waive rights would be unsupportable even under the looser test of *Schade v. State*, 512 P.2d 907 (Alaska 1973), we would have to disagree.

As we noted in *Walunga v. State*, 630 P.2d 527, 528 n.4 (Alaska 1980), "the proper standard of review is whether the superior court's finding of [competence to make the] waiver is supported by substantial evidence." Although the testimony of Dr. Burke, Dolchok's expert witness, was to the effect that Dolchok was unable to distinguish between his internal emotional life and his environment, this was countered by the testimony of Dr. Rader that Dolchok's capacity to make reasoned decisions about legal matters affecting him, and to understand the consequences of those decisions, was not substantially impaired. Additionally, Dolchok's defense attorney at the initial trial asserted his belief in Dolchok's comprehension at the time Dolchok waived his right to jury trial, a statement entitled to deference in its own right, *Fajeriak v. State*, 520 P.2d 795, 802–03 (Alaska 1974), and also supported by the testimony of Dr. Langdon to the effect that Dolchok's trial attorney would be able to tell if Dolchok were unable to cooperate in his own defense due to mental illness. We thus conclude that the record supports the superior court's conclusion that Dolchok was competent to waive his right to a jury trial.

### E. *Effective Assistance of Counsel.*

Dolchok attacks the superior court's conclusion that he was not deprived of the effective assistance of counsel.

We laid out the appropriate standards to be applied to this issue in *Risher v. State*, 523 P.2d 421 (Alaska 1974):

Lawyers may display a wide spectrum of ability and still have their performance fall within the range of competence displayed by one of ordinary training and skill in the criminal law. It is only when the ability is below the nadir of that range that we would hold it to constitute a deprivation of effective assistance of counsel. We are not condoning the second-guessing of trial counsel in making the myriad decisions encountered in a criminal trial, for it is a truism that hindsight furnishes 20–20 vision. All that is required of counsel is that his decisions, when viewed in the framework of trial pressures, be within the range of reasonable actions which might have been taken by an attorney skilled in the criminal law, regardless of the outcome of such decisions.

There is a further highly relevant consideration which we find present in the cases brought to our attention in which convictions have been reversed for ineffective assistance of counsel. The conduct of counsel must have contributed to the eventual conviction. A defendant has not suffered an unconstitutional deprivation of effective assistance of counsel because of error committed by his attorney which in no manner contributed to his conviction. . . .

In effect, we are promulgating a two-pronged test. Before reversal will result, there must first be a finding that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard of competence which we have enunciated. Secondly, there must be a showing that the lack of competency contributed to the conviction. If the first burden has been met, all that is required additionally is to create a reasonable doubt that the incompetence contributed to the outcome.

*Id.* at 424–25 (footnotes omitted).

Dolchok argues that his defense attorney's representation fell short of this standard, relying mainly on testimony by his attorney at the post-conviction remedy hearing to the effect that he himself did not feel that he had been a competent lawyer in this case. He further testified to personal problems he was having before and during Dolchok's trial, to institutional problems the public defender agency was having, and to the fact that Dolchok's case had to be subordinated to several other pressing matters which were part of an unduly large caseload.

The superior court correctly applied the *Risher* standard, and found only two respects in which the attorney's judgment had, in retrospect, proved eventually to be erroneous: (1) the assumption that Judge Moody would be bound by the psychiatric testimony; and (2) the decision to allow the state to introduce the entire text of Dolchok's confession, which included those ancillary factual matters which formed the evidentiary basis for Judge Moody's finding that Dolchok was sane. The superior court found that neither of these rose to the level of inadequate representation, and we agree.

The conclusion that the congruence of psychiatric testimony would bind the trial judge was not an unreasonable one. Although this court had decided in *Bowker v. State*, 373 P.2d 500 (Alaska 1962), that a jury was not bound to decide the issue of insanity in accord with the expert testimony, the continued validity of that holding was questionable after passage of new legislation dealing with insanity defenses, ch. 119, SLA 1972. The new legislation required the state to prove that a defendant was sane beyond a reasonable doubt once the defendant had introduced some evidence of his insanity, overruling our holding in *Chase v. State*, 369 P.2d 997, 1003 (Alaska 1962), to the effect that the burden is on the defendant to prove insanity by a preponderance of the evidence. Indeed, in a case tried almost simultaneously with Dolchok's, then-superior court Judge Fitzgerald had held himself bound by the congruence of psychiatric testimony. It was not until Dolchok's case came up on appeal that *Bowker* was re-affirmed and extended to bench trials. In light of the confused state of the law prior to that decision, Judge Singleton was correct in finding that the defense attorney's conclusion was not below the standard articulated in *Risher*.

Nor did failure to contest, or excise portions of, Dolchok's confession fall below the *Risher* standard. It is clear from the testimony of the defense attorney at the post-conviction remedy hearing that he decided to allow the confession in to ease the prosecution's case, manifestly as part of the arrangement worked out with the prosecutor.

The acquiescence of the prosecutor in the insanity defense was a major triumph for the defense, and cooperating in the prosecution's case on the facts was a small concession, considering the strength of that case to begin with. It seemed extremely unlikely that Judge Moody would find Dolchok sane given the state of the evidence; the defense attorney testified that out of the several insanity cases which he "walked through" in a similar manner, Dolchok's was the only one in which the trial judge rejected the joint conclusion of prosecution and defense. Further, the significance which the ancillary factual matters in the confession took on in the course of the subsequent proceedings was not readily apparent at the point at which the defense attorney might have kept them out of the record. Given all these circumstances, we must conclude that defense counsel here performed at least as well as a lawyer with ordinary training and skill in the criminal law, and did conscientiously protect his client's interests. *See Risher*, 523 P.2d at 424.

Dolchok insists that there are several other grounds which the superior court ignored. We do not find the detailed and well-reasoned opinion of Judge Singleton to be deficient in that respect, and we agree that defense counsel's representation of Dolchok was not inadequate in these respects. Dolchok's attorney did not, according to the findings of the superior court, allow him to waive a jury trial without explaining what it was, obtain a jury waiver by any "false representations", or allow "conflicting considerations" to influence his representations. We agree with the superior court that defense counsel's evaluation of his own performance is more a reflection of his dedication to his representation of clients, and remorse at the disappointing result obtained in this case, than it is an objective assessment of his work in representing Dolchok. There is no merit to the inadequate representation argument.

F. *Admissibility of the Confession.*

 Dolchok has appealed the superior court's finding that his confession was not

obtained in violation of his Fifth and Sixth Amendment rights. We find his arguments meritless. His contention that he was incompetent to make such a waiver we reject for the reasons discussed above regarding his waiver of jury trial. His contention that the confession was obtained by having the police "stand in" for the priest which he had requested is untenable. His argument that his confession was involuntary because "compelled" by his desire for notoriety, we think, does not present any ground for suppression apart from the question of competence.

One other point should be addressed here. Dolchok, prior to his conviction on the murder charge, had been represented on separate criminal charges in Fairbanks by another public defender, Dick Madson. Madson was informed of Dolchok's being held for murder, and apparently visited the jail and spoke to Dolchok. Testimony by the defense attorney who represented Dolchok at the original murder trial indicated that he had spoken to Madson, and was told that Madson had obtained assurances from the police that Dolchok would not be questioned until an attorney was present. This was contradicted by the testimony of the police officer who allegedly gave this assurance, and Madson's own testimony indicated that he could not recall whether any such assurance had been given. The only written record is the page of notes taken by Dolchok's attorney of his conversation with Madson, and these notes are ambiguous. Judge Singleton would not allow Dolchok to refresh Madson's recollection with these notes, based upon his reading of former Civil Rule 43(g)(9).[35] This ruling was not erroneous.

### G. *Rescission of the Agreement.*

■ Dolchok has objected to one additional aspect of Judge Singleton's decision in the post-conviction remedy case: the conclusion that a partial new trial could be ordered without allowing Dolchok to rescind his waiver of jury trial. We consider this in conjunction with Dolchok's argument that Judge Moody, at the partial new trial, committed error in allowing the state to disavow its previous position that Dolchok was NGI.

It is evident from the record that at the original trial, Dolchok's defense attorney and the prosecutor were cooperating with each other. The prosecutor's agreement not to contest the NGI verdict, defense counsel's agreement not to contest the validity of the confession, and the mutual waiver of jury trial were part of a "package deal," as defense counsel put it. Both defense counsel and the prosecutor testified to the "agreement" they had between themselves.

Again, we think the most apt analogue to which courts should look in this area is that of plea bargaining. We see no reason for the courts to either encourage or discourage "walk-throughs" of NGI cases based upon agreements between defense counsel and prosecutor.[36]

**35.** Former Civil Rule 43(g)(9) reads in relevant part:

(9) *Use of Writing by Witness.*

[a] A witness may refresh his memory respecting a fact by anything written by himself or under his direction at the time when the fact occurred or immediately thereafter, or at any other time when the fact was fresh in his memory and he knew that the same was correctly stated in the writing. Any such writing may be inspected by the adverse party who may cross examine the witness and read the writing to the jury.

Former Civil Rule 43(g)(9) has been rescinded and replaced by the new Rules of Evidence, under which any writing, including the page of notes, can be used to refresh Madson's recol-

lection. *See* Alaska R.Evid. 612, which reads in relevant part:

(a) *While Testifying.* Any writing or object may be used by a witness to refresh his memory while testifying. If, while testifying, a witness uses a writing or object to refresh his memory, any party seeking to impeach the witness is entitled, subject to subdivision (c), to inspect the writing or object, to cross-examine the witness thereon, and to introduce those portions which relate to the testimony of the witness.

**36.** We have noted the ban on plea bargaining imposed by the Attorney General. *See* note 24 *supra* and accompanying text. That policy was not in effect at the time of the original trial in this case.

Although the terms of the agreement between defense counsel and prosecutor here are not exactingly delineated in the record, it does appear that defense counsel agreed to let in the confession unchallenged for the benefit of the prosecution; that the prosecution agreed not to contest the NGI verdict, partially for the benefit of the defense and partially from the prosecution's duty to insure that justice was done; and that both agreed to waive the right to jury trial, to their mutual advantage.

The record shows that the original trial prosecutor fulfilled his part of the bargain at the initial trial, resisting substantial pressure from Judge Moody to argue the position that Dolchok was sane. After Judge Singleton opened up the trial again, however, the state, in the person of a new prosecutor, did not regard itself as bound by the initial agreement, and vigorously contested the sanity issue.

In our view the state's action was not improper since it had fulfilled its bargain. Nor were the questioned rulings of Judge Singleton and Judge Moody erroneous. Once Judge Moody ruled that Dolchok was sane, both the prosecution and the accused were discharged from the agreement they had reached. In short, the agreement the parties had arrived at concerning the "walk-through" insanity proceedings terminated when Judge Moody found Dolchok sane. Thereafter the parties' agreement had no applicability to the partial new trial which had been ordered by Judge Singleton.

### H. *Other Partial New Trial Issues.*

██ Dolchok makes several other minor contentions concerning the partial new trial. He argues that Judge Moody incorrectly characterized the partial new trial as a continuation of the post-conviction remedy proceedings rather than a re-opening of the original trial. It is unclear what, if any, prejudice resulted from this; we find that if there was any error, it was harmless.

Dolchok also contends that Judge Moody erred in allowing the state to call new witnesses at the guilt stage of the proceedings since this was precluded by double jeopardy,

citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We agree with the state that *Burks* is inapplicable here. That case involved a denial of a motion for judgment of acquittal by the federal district court, reversed by the Sixth Circuit. The court of appeals went on to remand the case for trial, a ruling which the Supreme Court reversed on double jeopardy grounds. The Court was, however, careful to distinguish cases involving trial error from cases involving insufficiency of the evidence, *id.* at 15, 98 S.Ct. at 2149, 57 L.Ed.2d at 12. Since this case involves trial error rather than insufficiency of the evidence, *Burks* does not apply.

### I. *Conclusion.*

The rulings of Judge Singleton concerning Dolchok's application for post-conviction relief, and Judge Moody's rulings pertaining to the partial new trial, are AFFIRMED.

COMPTON, J., not participating.

SCHULZ, Superior Court Judge, dissenting.

I agree with the majority's resolution of all issues on these appeals with the exception of the jury trial issue discussed in part G of the majority opinion.

The record demonstrates that Dolchok's initial waiver of his right to trial by jury was based totally on the agreement reached with the state on the "walk through NGI." As the majority opinion indicates, the jury trial waiver in this case was part and parcel of the agreement by which this case was to be resolved. While I have no quarrel with the majority's conclusion that the state had discharged its obligations under the walk through NGI agreement "once Judge Moody ruled that Dolchok was sane" and that "both parties were discharged from the agreement they had reached," it seems to me that Dolchok should have been offered a jury trial on the partial new trial ordered by Judge Singleton.

A plea agreement is nothing more than a contract, and when one of the parties is

allowed to rescind his agreement, simple justice requires that the other side be placed on the same footing.

Whether one proceeds on a theory of full performance or of recision, the state has succeeded here in being able to contest the issue of Dolchok's sanity while holding him to his jury trial waiver under the terms of the original agreement. If the state is no longer bound, I do not believe Dolchok is either.

I would reverse on that issue and remand for a jury trial as to the partial new trial ordered by Judge Singleton.