Charles HENRY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4168.

Court of Appeals of Alaska.

Oct. 22, 1993.

Kevin F. McCoy, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

Charles Henry appeals his convictions and sentences for first- and second-degree sexual abuse of a minor. We affirm Henry's convictions, but we vacate Henry's sentences and remand this case for a new sentencing hearing.

In 1990, Henry lived in Chignik with his girlfriend, O.S., and her two daughters, nine-year-old S.S. and ten-year-old J.S. In late July, O.S. was away from home, engaging in commercial fishing, and J.S. was

in Anchorage for medical treatment. Henry remained in Chignik with S.S.

Late in the morning of July 23, 1990, Henry brought S.S. to the home of Mrs. K., a relative of S.S.'s, and then left. S.S. stayed with Mrs. K. and her nine-year-old son, A.J.K., for several hours. At some point in the afternoon, Mrs. K. left to go to the grocery store. While Mrs. K. was gone, S.S. told A.J.K. that she wanted to spend the night at his house, that she didn't want to go home, and that Henry was "sick". A.J.K. asked S.S. if Henry had ever touched her. S.S. said no three times, but when A.J.K. asked her a fourth time, she said that Henry had "[taken] down her clothes and ... got on top of her." S.S. also told A.J.K. that Henry had given her $16.00 not to tell anyone.

At about 4:50 p.m., while Mrs. K. was still away, Ronald L. Bowers, the Chignik village public safety officer and fire chief, brought some fish to Mrs. K.'s neighbor. A.J.K. saw Officer Bowers and told him that S.S. had said that Henry had hurt her. Officer Bowers came to Mrs. K.'s house and found S.S. sitting in a corner with her head down, acting somewhat frightened and concerned.

When Officer Bowers asked S.S. if she had anything to tell him, she didn't say anything. Then Officer Bowers asked her if she had told A.J.K. that Henry had hurt her; he told S.S. that, if she was hurt, he would help her. According to Bowers, S.S. then replied that "she was hurting where [Henry] humped her. She said that ... she took a shower the night before and that [Henry] came into her bedroom and took her pants down and that he humped her, and that he 'wet' inside her. She said she was afraid to go back home." S.S. also told Officer Bowers that, although Henry had never done this to her before, she had seen Henry try to do it to her sister, J.S., but J.S. had pushed him off.

Officer Bowers left the K. residence. When Mrs. K. returned home after Officer Bowers left, A.J.K. and S.S. informed her that Henry was going to be arrested. A.J.K. told his mother that Henry had touched S.S., that they had told Officer

Bowers, and that Officer Bowers was out looking for Henry. Mrs. K. asked S.S. why Bowers was looking for Henry, and S.S. answered that Henry had "raped" her the night before. Mrs. K. asked S.S. if she knew what the word "rape" meant, and S.S. said she knew. Then Mrs. K. asked S.S. if Henry had touched her private parts, and S.S. said yes.

Meanwhile, Bowers had gone into town to call his supervising trooper, Joseph Masters. Trooper Masters instructed Bowers to contact O.S. on her fishing boat and to arrest Henry. Officer Bowers arrested Henry shortly thereafter.

O.S. returned to Chignik around 9 o'clock that evening, approximately two hours after Henry's arrest. She allowed S.S., accompanied by Mrs. K., to be taken to Dillingham for a medical examination.

Doctor Thomas Bellinger examined S.S. at Kanakanak Hospital in Dillingham. Trooper Belden and Mrs. K. told Dr. Bellinger that S.S. was a possible sexual abuse victim. S.S. told Dr. Bellinger that she had been in her bedroom, trying to sleep, when someone "undressed [himself] and undressed her and tried to put his private parts in hers." S.S. indicated to Dr. Bellinger that it was her mother's boyfriend who had done this.

Dr. Bellinger found several bruises on S.S.'s knees and shins, which he estimated to be less than two to three days old. Dr. Bellinger noted that S.S.'s hymen was intact, but he testified that this did not rule out penetration. He also measured the diameter of S.S.'s vaginal opening. He determined that the measurement was within normal range for children of S.S.'s age and height; therefore, he could not conclude that she had been penetrated. Examination by Woods lamp (an ultraviolet light device) revealed an area on S.S.'s labia majora that could have been either a fungal infection or sperm. Dr. Bellinger found no other evidence of fungal infection, and further tests for sperm were negative. From this Dr. Bellinger determined that the Woods lamp results were inconclusive. Based on the entire examination, Dr.

Bellinger concluded that he could not tell whether S.S. had been sexually penetrated.[1]

Mrs. K. and S.S. spent the night in Dillingham. The next morning (July 24), Trooper Belden interviewed S.S. at the Alaska State Troopers office. S.S. told Belden that Henry had put his penis in her "bottom" the night before.

Three days later (July 27), Troopers Steven C. DeHart and Rosemary Decker conducted a videotaped interview of J.S. in Anchorage. J.S. told Investigator Decker that Henry had touched her "private part" under her nightgown and over her underwear. At some point during the interview, Trooper DeHart told J.S. that her sister S.S. had accused Henry of sexual abuse. However, it is unclear whether J.S. knew, when she told the troopers that Henry had sexually abused her, that S.S. had already accused Henry of sexual abuse.[2] The evidence is also unclear as to whether J.S. knew that S.S. had accused Henry of trying to abuse J.S. The record does show that several times, when Investigator Decker or Trooper DeHart was about to conclude the interview and turn off the video recorder, J.S. stopped them and stated that she wished to continue.

On July 30, 1990, S.S. and J.S. testified before a grand jury considering charges against Henry. Shortly before S.S. was scheduled to testify, O.S. told Trooper Masters that, three days before, S.S. had confessed to her that A.J.K., not Henry, had sexually abused her. Trooper Masters immediately re-interviewed S.S. At the time, S.S. indicated that both A.J.K. and Henry had abused her.

At grand jury, the two sisters reiterated their assertions that Henry had sexually abused them. S.S. testified that Henry had sexually abused her twice. S.S. also told the grand jury that Henry had "hurt" her sister J.S. in the same way. J.S. testified that Henry had touched her genitals through her clothes.

A few months later, O.S. contacted the Public Defender Agency (who was representing Henry) and said that she had something important to tell them. In response to O.S.'s call, a Public Defender investigator interviewed S.S. S.S. told the defense investigator that Henry had not abused

---

1. In apparent contradiction to Dr. Bellinger's testimony, both Officer Bowers and Trooper Belden testified that Dr. Bellinger had told them that, based on his examination, he had concluded that S.S. had been penetrated. The State did not directly attempt to impeach Dr. Bellinger's trial testimony with these possibly inconsistent prior statements.

2. On cross-examination, Trooper DeHart testified that he told J.S., "The reason [I was asked to interview you is that another trooper] told me that [Henry], while [your] mom was gone fishing, had molested your younger sister. Now is that ... right? Can you answer me, yes or no?", and J.S. said, "Yes." However, DeHart conducted the second part of the interview. Investigator Decker conducted the first part of the interview, and it was during this first portion of the interview that J.S. told the troopers that Henry had touched her "private part" through her clothes. It thus appears, although the matter is not entirely clear, that J.S. accused Henry of sexual abuse before the troopers told her that S.S. had made the same accusation.

When J.S. was cross-examined at Henry's trial, she gave the following testimony:

DEFENSE COUNSEL: You talked to your mom about what [S.S.] said had happened, or what you thought had happened, right?
J.S.: Yes.

DEFENSE COUNSEL: Okay. So when you went [into the interview], at [that] time you thought maybe [Henry] had done something bad to your little sister ..., right?
J.S.: Yes.

However, J.S. also gave this testimony when she was recalled to the stand during the defense case:

DEFENSE COUNSEL: Did you think [Henry] had done something bad to [S.S.] at [the time of your interview]?
J.S.: No.
DEFENSE COUNSEL: You didn't think he had done something bad to [S.S.]?
J.S.: No.

. . . . .

PROSECUTOR: Okay, pretend you're back there right now, and let's say that I'm the lady trooper [Decker], and I'm going to ask you some questions. Now, when you were back there with that lady, did you believe [Henry had] hurt your sister?
J.S.: (Inaudible)
PROSECUTOR: You didn't believe he [had] hurt your sister. Who have you been talking to these last couple of days, [J.S.]?
J.S.: No one.

her, and that A.J.K. had. S.S. further stated that A.J.K. had threatened her and had told her to say that Henry had raped her, and that both she and A.J.K. had lied to the authorities. In addition, S.S. told the defense investigator that she did not even know what the word "rape" meant.

Acting on this new information, the defense investigator interviewed J.S. J.S. told the investigator that Henry had never touched her. She asserted that no one had pressured her to change her story, and she declared that she had never spoken to her mother about Henry's abusing her. J.S. told the investigator that Mrs. K. had pressured her into accusing Henry of sexual abuse.

Henry's trial began a few weeks later. Both S.S. and J.S. were called as witnesses. S.S. initially testified that she could not remember whether Henry had sexually abused her, and that she could not remember telling anyone that he had. S.S. then flatly denied that Henry had done "anything ... bad." S.S. testified that A.J.K. had tried to sexually abuse her, and that he had told S.S. to say that Henry had done it because A.J.K. did not like Henry.

J.S. likewise denied that Henry had touched her. She gave inconsistent answers when asked whether she had told Investigator Decker that Henry had sexually abused her. However, J.S. declared that she had falsely accused Henry. She gave two explanations for this. First, J.S. asserted that Mrs. K. had told her to accuse Henry of sexual abuse or she would hurt S.S. J.S. stated that Mrs. K. had made this threat and demand in early July, before J.S. left for Anchorage. Later, during direct examination by the defense attorney, J.S. gave a different explanation for accusing Henry of sexual abuse:

DEFENSE COUNSEL: Do you remember telling [the troopers] that [Henry] touched you in a private place?

J.S.: Yes.

DEFENSE COUNSEL: Okay. [J.S.], why did you tell the troopers that [Henry] touched you?

. . . . .

J.S.: Because he wasn't my dad.

DEFENSE COUNSEL: Okay. Were you mad at [Henry]?

J.S.: Yes.

DEFENSE COUNSEL: Okay. Are you sure that's the only reason you told them that he touched you?

J.S.: Yes.

. . . . .

DEFENSE COUNSEL: Okay, but I'm not sure I understand. Why would you say something like that just because [Henry] wasn't your dad?

J.S.: I didn't want him around.

DEFENSE COUNSEL: Okay, were you mad at him?

J.S.: Yes.

Like her sister, J.S. denied speaking to her mother about Henry's touching her. J.S. also testified that, before the troopers interviewed her in Anchorage, Officer Bowers had telephoned her and told her that something had happened involving S.S. and Henry.

The jury found Henry guilty of one count of first-degree sexual abuse of a minor (for engaging in sexual penetration of S.S.) and one count of second-degree sexual abuse of a minor (for engaging in sexual contact with J.S.).

Henry argues that, because S.S. and J.S. recanted their allegations of sexual abuse at his trial, the State did not present sufficient evidence to support his convictions. Henry relies on this court's decision in *Brower v. State*, 728 P.2d 645, 647–48 (Alaska App.1986), which established the requirement that, when the purported victim of sexual abuse recants the accusation at trial, the State must present corroborating evidence to support the prior allegation of sexual abuse. But while *Brower* requires corroborating evidence, this corroborating evidence need not take any specific form, and it need not independently establish the crime. *Thompson v. State*, 769 P.2d 997, 1000 (Alaska App. 1989); *Bodine v. State*, 737 P.2d 1072, 1075–76 (Alaska App.1987). *See also Shel-*

*don v. State,* 796 P.2d 831, 839 (Alaska App.1990). "The rule governing corroboration is a flexible one, ... grounded in common sense: corroborating evidence is sufficient [when] it induces a rational belief in the truthfulness of a witness' testimony." *Bodine,* 737 P.2d at 1075.

■ When judging the legal sufficiency of the evidence, we must construe the evidence in the light most favorable to upholding the jury's verdicts. *Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981); *Silvernail v. State,* 777 P.2d 1169, 1172 (Alaska App. 1989). In Henry's case, we conclude that S.S.'s and J.S.'s independent accusations of sexual abuse are sufficient corroborating evidence.

In her initial statements to the K. family and to the police, S.S. said not only that Henry had sexually penetrated her, but that Henry had tried to do the same thing to J.S. Shortly afterwards, J.S. corroborated S.S.'s accusation; she told the troopers that Henry had touched her genitals. Viewing the testimony in the light most favorable to the State, J.S. made this accusation against Henry without knowing that S.S. had already made a similar accusation. The two sisters repeated their accusations at grand jury. Then, as Henry's trial drew nearer, both sisters simultaneously recanted their accusations and instead protested Henry's innocence. We note that, at Henry's trial, J.S. gave two materially conflicting explanations of why she had been motivated to falsely accuse Henry of sexual abuse. J.S. first stated that Mrs. K had threatened to hurt her sister, S.S., unless J.S. accused Henry of sexual misconduct; but J.S. later declared that her only motivation had been resentment against Henry himself.

We conclude that these circumstances gave the jurors a rational basis to distrust the sisters' recantations at trial and to credit the sisters' earlier statements to the authorities and their testimony at grand jury. Therefore, the requirement of corroboration was met, and the jury's verdicts are supported by sufficient evidence.

Henry next argues that he should be granted a new trial because the prosecuting attorney made several improper comments during opening statement, examination of witnesses, and summation. Henry did not object to any of these comments when they were made, so we review his claims for plain error only. *Potts v. State,* 712 P.2d 385, 390 (Alaska App.1985).

■ Henry's first allegation concerns a comment the prosecutor made during his opening statement to the jury. The prosecutor was explaining that S.S. and J.S. had recanted their accusations of sexual abuse, and that it was the State's theory that the sisters had done this because they were under pressure from their mother, O.S.:

> PROSECUTOR: And [their stories] changed somewhat, based on the additional contact these two girls had with their mom—their mom, the defendant's girlfriend. These cases are tragic: alliances are set up, the statements are made.

The prosecutor then wondered, rhetorically, whether the jurors might be asking themselves why the State of Alaska had involved itself in the affairs of this family. He proceeded to answer his own question:

> PROSECUTOR: Our presence [in this case] is [so] that kids ten years old are not ... violated. If their mom is not going to protect them, then we are; [child abuse is] against the law.

Given the circumstances of this case (two sisters allege that their mother's boyfriend has sexually molested them, and subsequently retract the allegations after he is indicted), we do not find the prosecutor's comment to be plain error.

■ Henry also asserts that the prosecutor made another improper comment during opening statement when he referred to Henry as a "child molester". This comment occurred toward the end of the prosecutor's opening statement:

> PROSECUTOR: It's the State's position, a very strong position, that [the defendant] is a child molester. He took an opportune time to violate two young girls. You'll find, when this trial is over with, that you may have some anger.

Put that aside. You may have some feelings. Put [them] aside. Because, as the court said, feelings have nothing to do in this courtroom.... The evidence is what people testify to, under oath. Listen to it. When the trial is over, you'll find there can be no verdict in this case but guilty.

In context, the term "child molester" appears to have merely summarized the prosecutor's contention that Henry was guilty of sexually abusing two minors. Henry argues that labeling him a "child molester" is more inflammatory than asserting that he is guilty of sexually abusing children. To the extent that this might be true, the prosecutor immediately cured the inflammatory connotation by telling the jury that they were to be governed solely by the evidence, not their feelings. We find no plain error.

■ Henry next complains of a question the prosecutor asked the children's mother, O.S., during her examination. As noted above, O.S. is Henry's girlfriend; Henry had lived at her house for a year and a half, and they planned to marry. O.S. had been away from home, commercial fishing, when Officer Bowers contacted her to tell her that S.S. had reported being sexually assaulted. By asking O.S. about her response to S.S.'s report that she had been assaulted, the prosecutor attempted to demonstrate that O.S. had lacked normal concern over the possibility that Henry had sexually abused her daughter.

The prosecutor paid particular attention to the fact that, even though O.S. had returned to Chignik in response to Bower's call, she did not accompany S.S. to Dillingham for the physical examination and trooper interview. Instead, O.S. asked K.K. to accompany S.S. to Dillingham, while O.S. stayed in Chignik with Henry. O.S. explained that she was "too tired and ... dirty" to make the trip. The prosecutor then asked O.S. if it was true that she had told people she was not going to Dillingham with S.S. because she wanted to return to the fishing grounds as soon as possible. O.S. admitted that she might have told people that the reason she didn't

go to Dillingham with S.S. was that she wanted to fish some more, but she asserted that she never did return to the fishing "because the whole thing made me sick". Nevertheless, the prosecutor persisted:

PROSECUTOR: I'll ask you again: You let [K.K.] take [S.S.] into Dillingham for a doctor to look at her because she said she had been raped, correct?

O.S.: Uh-huh.

PROSECUTOR: Okay. Did you tell people you let [K.K.] do that because you wanted to go fish some more?

O.S.: Yeah, I told her [that] I was going to go back out fishing, but I didn't feel like it.... This whole thing made me sick.

PROSECUTOR: Mrs. [S.] ...

O.S.: So I just stayed home, and I said, "The heck with it; I ain't going fishing again."

On cross-examination, Henry's defense counsel attempted to ameliorate the effect of this testimony by asking O.S. if she had seen any signs that S.S. had in fact been assaulted:

DEFENSE COUNSEL: Did [S.S] complain of any soreness?

O.S.: No.

DEFENSE COUNSEL: Did she complain of any hurting at all?

O.S.: No, because I asked her if she was hurting, and she said no.

DEFENSE COUNSEL: Did she complain about any bleeding?

O.S.: Unh-unh.

DEFENSE COUNSEL: Did you check to see if she had anything like that?

O.S.: Yes, I checked her, and I didn't see nothing.

DEFENSE COUNSEL: Did you ...

O.S.: I figured she'd be torn up or bleeding or something, but she didn't have nothing.

DEFENSE COUNSEL: How did she act as far as her behavior? ... Was she upset? Did she act upset? Did she act happy? Or normal? ... How did she act?

O.S.: She acted happy.

On re-direct, the prosecutor returned to this subject:

> PROSECUTOR: You said to ... [the defense attorney] and to this jury something which I wrote down in large print. You said [that] you examined [S.S.], and you said, "I didn't see anything."
>
> O.S.: Yeah, I figured I'd see her bleeding or something, or in pain. I didn't see nothing.
>
> PROSECUTOR: Did you see any pain in her heart?
>
> O.S.: No.
>
> PROSECUTOR: Do you know that a person doesn't have to be bleeding and torn apart to have somebody hurt them sexually? Did you know that?
>
> O.S.: I didn't know that.

Henry argues that the prosecutor's question, "Did you see any pain in her heart?", was argumentative. It was. However, there was no objection. Moreover, the prosecutor immediately followed his improper question with another that was more to the point: he asked O.S. if she knew that sexual abuse does not always leave the child-victim visibly injured. We do not believe that the course of Henry's trial was affected by the isolated argumentative question he complains of; thus, we find no plain error.

■ Henry next challenges a portion of the prosecutor's direct examination of Trooper Ron Belden, the officer who interviewed S.S. in Dillingham and who subsequently led the investigation of the case against Henry. Early in Belden's direct examination, the following exchange occurred:

> PROSECUTOR: Trooper, in your 16 years as a trooper, about how many sexual assaults have you investigated? Not arrested or convicted individuals, just the complaint comes in. How many of those have you investigated? How about last year, can you remember ... that?

> BELDEN: I'd say, in the last year, approximately 10 to 15, I imagine.
>
> PROSECUTOR: Okay. Do all those cases come to trial?
>
> BELDEN: No.
>
> PROSECUTOR: Do all those cases result in the arrest of an individual?
>
> BELDEN: No.
>
> PROSECUTOR: Why is that?
>
> BELDEN: Well, some are unfounded. Some may not have enough evidence to prosecute on.
>
> PROSECUTOR: And some may not be a real crime?
>
> BELDEN: That's correct.

Even though the defense attorney did not object to this exchange, there were obvious grounds for objection. The prosecutor's questions and the trooper's answers implied that Belden was an experienced sex abuse investigator who knew how to screen out unfounded allegations of sexual abuse, and that, since the case against Henry had been pursued rather than dropped, the accusations against Henry must be well-founded.[3]

■ However, we will not find plain error when there appears to have been a tactical reason to withhold objection. *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989); *Potts v. State*, 712 P.2d 385, 394 n. 11 (Alaska App.1985). In the present case, Henry's attorney apparently chose to respond to Belden's testimony, not by objecting, but by pursuing the matter again during cross-examination.

Because S.S. had clearly accused Henry of sexually penetrating her in her interview with Trooper Belden in Dillingham, and because J.S. had clearly accused Henry of engaging in sexual contact with her in her interview with the troopers in Anchorage, Henry was essentially forced to concede that the troopers had had sufficient reason to launch their criminal investigation. Henry therefore adopted a trial strategy of asserting that the troopers had, early on,

---

**3.** We note that this exchange between prosecutor and trooper investigator was not prompted by a defense attack on the motives of these officials or an assertion that, in cases involving sexual abuse of children, they were generally disinclined to look for or believe exculpatory evidence—circumstances that might have justified this type of examination.

become so emotional about S.S.'s accusation and so convinced that Henry was guilty that they stopped asking the questions that would get to the truth of the matter, and that they began ignoring the evidence that Henry was, in fact, innocent.[4]

In apparent accord with this strategy, Henry's attorney did not object to Belden's assertion that he believed Henry was guilty. Instead, during cross-examination, the defense attorney asked Belden to reiterate this belief, trying to derive advantage from the fact that Belden had become subjectively convinced of Henry's guilt:

DEFENSE COUNSEL: You referred to [S.S.] as a "victim". But, at that point in time, she was an alleged victim— wouldn't that be a more accurate characterization?

BELDEN: If [you are asking my opinion], I'd say [she] is a victim.

DEFENSE COUNSEL: You would say [she] is a victim?

BELDEN: Yes.

DEFENSE COUNSEL: Okay, so at the time you questioned this child, you assumed she was a victim?

BELDEN: That's not what I said.

DEFENSE COUNSEL: Okay, well, tell me what you said regarding that.

BELDEN: I use the word "victim" today; upon talking to her and listening to her, her reactions, I'd say she was a victim.

DEFENSE COUNSEL: Okay. You made that determination, then, before ... trial—that she was a victim, correct?

BELDEN: Yes, I wouldn't be here today if I [hadn't].

Asking a state trooper to announce his belief in the defendant's guilt obviously presents a two-edged sword for the defense. Nevertheless, such a tactic is within the realm of reasonable defense strategies. We therefore find no plain error.

■ Henry also complains of the manner in which the prosecuting attorney returned to Belden's testimony during his summation to the jury. Responding to Henry's assertion that the authorities had unjustifiedly prosecuted Henry, the prosecutor argued:

If you folks want to believe that the State of Alaska has nothing else to do, and the four troopers in this region have nothing else to do, but create bogus cases against our citizens, then I guess you should walk him out of the door, if that's what you think we do out here. More particularly, if you remember the testimony of both troopers, who indicate[d that] they investigate sexual assaults with some frequency, they look at cases, they talk to witnesses, they talk to people, *and some cases are unfounded, was the word Trooper Belden uses. And the person is not prosecuted because of that. The allegations are unfounded.* Well, I guess if you think that when a little girl reports to her best friend that something happened, and that same report is given to a VPSO, and that same report is given to an Alaska State Trooper, that we shouldn't prosecute

---

4. During closing argument, Henry's attorney explicitly argued that all the officials had assumed from the beginning that Henry was guilty, and that, despite later exculpatory evidence, no one was willing to question this assumption:

DEFENSE ATTORNEY: And, again, we're not saying [that] any of these people ... who got involved—we're not saying [that] Trooper Masters is a bad man with bad motives. We're not saying [that] Trooper Belden is a bad man with bad motives. We're not saying [that] Ron Bowers is a bad man with bad motives—although that may be questionable. We're saying that, when people get involved in a situation that's charged with emotion like this, they get caught up in it. They get caught up in believing it because [their] instinct is,

"Oh, my God! What has happened? We've got to protect these little children."

But their jobs are also to find the truth, not to assume he's guilty and work from there. And that was not done in this case.

· · · ·

We're saying that, from the get-go, everyone—including Ron Bowers, who is the first official person involved here—wants to believe the story, because [their] instinct is to protect this child. No one ever says, "Maybe he's not [guilty], maybe he's not. Let's find out more." ... Everyone involved in this case has made mistakes. Everyone.... Everyone has made mistakes, to turn this into a nightmare.

those cases, I guess that that's what we should do.

(emphasis added)

We agree with Henry that this argument was improper. It contains the same potential for unfair prejudice as the previously described direct examination—the assertion that police professionals who know how to evaluate a criminal case have determined that Henry is guilty, and the jury should accept their conclusion. However, the prosecutor's statement could be viewed as illustrative of Henry's claim that the authorities had prejudged the case after hearing S.S.'s initial report of sexual abuse. Given Henry's tactical response to Belden's testimony, we cannot find plain error in defense counsel's failure to object to the prosecutor's argument.

■ Finally, Henry contends that the prosecutor exceeded the proper scope of argument when he told the jury:

*[S.S.] may be a slow learner; [S.S.] may be mildly retarded.* [S.S.] came to Trooper Belden and told [him that] the defendant sexually assaulted her. *[J.S.] loves her mother very much and so does [S.S.]. This is a complex, traumatizing situation. We've got two young girls who love their mother, the only parent left, and a mother who loves the defendant.*

I'm not suggesting to you ... that [O.S.] actually sat these girls down and said, "I want you to go and lie." But you as parents, you as adults, ... as to what you heard today, [you] understand that pressure can be very subtle. We know what our parents like and don't like. We know when—what it means that I want [Henry] back home. *I ask for you, when you do deliberate in this case, don't congratulate the defendant because he chose two victims who love their mom. Don't congratulate him because he picked a young girl who is slower than the rest.* Don't congratulate him because it was decided to interview people late in time, by the time their stories got all confused. If you congratulate him for this, then there is some problem here in the system.

This is not an enjoyable process for me, [defense counsel], or anybody. It is not fun, but you as society, you as people, have an obligation, and part of that obligation is to sustain what we do as people. And part of that sustenance is to say, "This little girl, I believe. This second little girl, I believe. They were violated by that man." There must be a verdict of guilty on all three counts. There must.

(emphasis added) Henry asserts that, by arguing the case this way, the prosecutor essentially urged the jury to convict on emotion—the antipathy the jurors might feel toward an adult who would victimize a retarded child, or the sympathy they might feel toward children whose mother refused to protect them.

However, the prosecutor's reference to S.S.'s level of mental functioning was apparently made in anticipation of Henry's argument that S.S.'s initial accusations of sexual abuse had been the product of suggestion and undue influence. A few minutes later, Henry's attorney in fact argued to the jury that nine-year-old S.S. was "a little five-year-old to six-year-old girl, as far as her mentality is concerned, who is highly suggestible, who is [easily] led, [easily] influence[d]". As to the prosecutor's statements about the love S.S. and J.S. had for their mother, this was merely a reiteration of the prosecutor's basic theme that the sisters had recanted because of pressure from O.S., that their recantations should not be trusted, and that the jury should believe the girls' initial accusations. We find no plain error.

■ For these reasons, we reject Henry's contention that he should receive a new trial because of statements the prosecutor made during examination of witnesses and argument. We turn now to Henry's final contention on appeal: that the judge should have been personally present at his sentencing hearing rather than presiding by telephone.

On August 7, 1991, Henry, his attorney, and the prosecutor appeared for sentencing in Anchorage. Superior Court Judge Don-

ald D. Hopwood conducted the proceedings by telephone. Judge Hopwood, who resides in Kodiak, had earlier informed the parties that he intended to preside telephonically at the sentencing hearing. Henry filed an objection to this announced procedure, arguing that he was entitled to stand face-to-face with the judge who sentenced him. Judge Hopwood, relying on Criminal Rule 38.1, overruled Henry's objection.

On appeal, Henry renews his argument that a criminal defendant is entitled to appear personally before the sentencing judge. Henry's appeal requires us to reconcile two potentially conflicting provisions of the Alaska Criminal Rules.

 Criminal Rule 38(a) declares that a defendant's presence is required "at the imposition of sentence".[5] At the same time, Criminal Rule 38.1(a) apparently empowers a judge to preside telephonically at any criminal proceeding, including a sentencing, regardless of whether the defendant is participating in person or by telephone:

> ... The court may allow telephonic participation of one or more parties, counsel[,] or the judge at any proceeding in [the court's] discretion.

The question presented in this case is whether a defendant's right under Criminal Rule 38(a) to be physically present at sentencing constrains a judge's authority under Criminal Rule 38.1(a) to preside at sentencing by telephone. We hold that it does. Unless the defendant consents to communicate with his or her sentencing judge by telephone, the judge must be physically present with the defendant when the defen-

dant exercises his or her right of allocution and when the judge initially pronounces the defendant's sentence.[6]

The United States Supreme Court has indicated that a defendant's right to be present "at every stage" of criminal proceedings is rooted both in the confrontation clause of the Sixth Amendment, *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970), and in the due process guarantees of the Fifth and Fourteenth Amendments, *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987); *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam). The Alaska Supreme Court has adopted this view as a matter of state constitutional law: "[I]n Alaska, the [defendant's] right to be present [at every stage of the trial] is founded on the state constitutional rights of the accused to due process and to confront the witnesses against him. Alaska Constitution art. I, §§ 1 and 7." *Wamser v. State*, 652 P.2d 98, 101 n. 10 (Alaska 1982); *accord Dolchok v. State*, 639 P.2d 277, 283 (Alaska 1982). Regarding the first sentence of Criminal Rule 38(a)—the provision guaranteeing a defendant's right to be present at sentencing—the Alaska Supreme Court has stated that the rule is premised on the "leading principle ... of criminal procedure ... that, after indictment ..., nothing shall be done in the absence of the [defendant]." *Noffke v. State*, 422 P.2d 102, 104 (Alaska 1967), quoting *Lewis v. United States*, 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011, 1012 (1892).

 Henry's case does not involve the right of confrontation. The State did not

**5.** Criminal Rule 38.1(a) recognizes that a defendant may waive the right of personal appearance and agree to participate by telephone: "In any proceeding at which the defendant's presence is required under Criminal Rule 38(a), as modified by Rule 38.2, the defendant may waive the right to be present and request to participate by ... telephone."

**6.** This court has previously held that a defendant's physical presence is not invariably required at later proceedings that might affect the initial sentence—e.g., reduction of the sentence after a successful sentence appeal, or a hearing

on a motion to modify the sentence under Criminal Rule 35(b). *Fowler v. State*, 766 P.2d 588, 589 n. 1 (Alaska App.1988); *Tookak v. State*, 680 P.2d 509, 511 (Alaska App.1984); *accord State ex rel. Everett v. Hamilton*, 175 W.Va. 654, 337 S.E.2d 312 (1985). And compare *Rivett v. State*, 395 P.2d 264, 269–270 (Alaska 1964), holding that, at least when there is "no ... substantial issue of fact[ ] concerning events in which [the defendant] participated", a defendant need not be personally present at the hearing on a motion to withdraw a guilty plea.

present evidence at Henry's sentencing; the hearing was devoted solely to the sentencing arguments of the parties and to Henry's allocution. We additionally note that, even if the State had presented evidence, Henry would have been there to confront it. However, as noted above, a defendant's right to be present at sentencing also rests on notions of due process. Because of this due process aspect, the defendant's right to be present extends, not simply to proceedings in which the defendant confronts adverse witnesses or evidence, but to any trial-related proceeding at which the defendant's presence has a "reasonably substantial" relation to the defendant's ability to defend against the criminal charge: "Thus, [under the Due Process Clause,] a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer,* 482 U.S. at 745, 107 S.Ct. at 2667.

Moreover, the Alaska Supreme Court has indicated that Criminal Rule 38(a) may confer a broader right of presence than would otherwise be required by the constitutional guarantees of confrontation and due process. In *State v. Hannagan,* 559 P.2d 1059, 1064 (Alaska 1977), the court held that Criminal Rule 38(a) guarantees a defendant the right to be present when testimony is played back to the jury, even though the court also indicated that, under normal circumstances, the error would be harmless since no evidence is taken and nothing is litigated at jury playbacks. *Id.* at 1066. Similarly, in *Dolchok v. State,* 639 P.2d 277, 283–85 (Alaska 1982), the supreme court held that it was error for the defendant to be absent from a pre-trial

conference at which only purely legal and procedural matters were discussed. (As in *Hannagan,* the supreme court indicated that a defendant's absence from a conference of such a circumscribed scope would normally be harmless. *Id.* at 284–85.)

It appears that a defendant's absence from the type of proceedings involved in *Hannagan* and *Dolchok* would not violate the Federal Constitution. In *Kentucky v. Stincer,* the United States Supreme Court held that neither a defendant's Sixth Amendment right to confrontation nor his Fourteenth Amendment right to due process of law required the defendant's presence at an in-chambers examination to determine a witness's competency to testify. The Court declared, "Respondent has given no indication that his presence at the competency hearing ... would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify". *Stincer,* 482 U.S. at 747, 107 S.Ct. at 2668. That is, relying on the same reasons the Alaska Supreme Court gave for finding violations of Criminal Rule 38(a) to be harmless, the United States Supreme Court declared that the Federal Constitution had not been violated at all. From this, we conclude that the right of presence granted by Alaska's Criminal Rule 38(a) is broader than the right arising from the federal constitutional guarantees of confrontation and due process.

We need not decide whether Criminal Rule 38(a) is co-extensive with or broader than the Alaska Constitution's guarantees of confrontation and due process, because we conclude that Rule 38(a) was violated by the superior court's decision to conduct Henry's sentencing telephonically.[7]

---

7. We recognize that, in *State v. Hannagan,* the Alaska Supreme Court spoke of the constitutional underpinnings of Criminal Rule 38(a) when the court ruled that trial judges are required to obtain a defendant's personal and express waiver of Rule 38(a) before conducting proceedings in the defendant's absence. Moreover, the court applied a "harmless beyond a reasonable doubt" standard when deciding whether a violation of Rule 38(a) required reversal of a conviction. *Hannagan,* 559 P.2d at 1064–65.

However, despite *Hannagan*'s indications that Rule 38(a) might be no more than a reiteration of the defendant's state constitutional right to be present, the supreme court's later decision in *Dolchok v. State,* 639 P.2d 277 (Alaska 1982), clarified that Rule 38(a) was separate from and potentially broader in scope than the related constitutional protections of confrontation and due process. In *Dolchok,* the supreme court stated that it had decided to employ the "harmless beyond a reasonable doubt" standard of error to violations of Criminal Rule 38(a) be-

Even though no evidence was presented at Henry's sentencing, Henry exercised his right of allocution (protesting his innocence of the charges against him). Because of Judge Hopwood's ruling, Henry was forced to communicate telephonically with the judge who, a few moments later, was to sentence him.

The supreme court has emphasized the importance of in-person allocution by a criminal defendant at sentencing. In *Nattrass v. State*, 554 P.2d 399, 402 (Alaska 1976), the court pointed out that "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." (quoting *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670, 673 (1961)). Later, in *Mohn v. State*, 584 P.2d 40, 44 (Alaska 1978), the court reiterated "the importance of giving a defendant the opportunity to personally make a statement to the sentencing court". The court continued:

[T]here is no substitute for the impact on sentencing which a defendant's own words might have if he chooses to make a statement. While it is true that the presentence report ... contained a number of statements made by Mohn to the probation officer and others, we do not think that a written statement can adequately take the place of a verbal one made in the presence of the court.

*Mohn*, 584 P.2d at 44–45.

This court, too, has recognized the importance of a defendant's personal presence at sentencing—the importance of in-person allocution and the psychological difference of having the sentencing judge and the defendant address each other face-to-face. In *Tookak v. State*, 680 P.2d 509 (Alaska App. 1984), this court quoted with approval the following passage from the Comment, *Due*

*Process at Sentencing: Implementing the Rule of United States v. Tucker*, 125 U.Pa. L.Rev. 1111, 1128–29 (1977):

[The procedural safeguards at sentencing include] the right of the defendant to be present ... and the defendant's right to make a statement on his own behalf[.] ... [I]t may be advantageous to the defendant if the judge faces him while meting out punishment.

*Tookak*, 680 P.2d at 511.

Criminal Rule 38.1 gives a judge general discretion to conduct proceedings telephonically, but it does not purport to give a judge the authority to preside telephonically under any and all circumstances. Given the importance of face-to-face contact between a defendant and a sentencing judge, and given the fact that Criminal Rule 38(a) guarantees a defendant's personal presence in front of the sentencing judge when sentence is pronounced, we conclude that Judge Hopwood exceeded the range of discretion conferred by Criminal Rule 38.1 when he conducted the sentencing hearing telephonically without Henry's consent.[8]

We therefore vacate Henry's sentencing and require that he be resentenced. In view of our resolution of this issue, we need not address Henry's other sentencing contentions.

Henry's convictions are AFFIRMED, but his sentence is VACATED. The superior court shall conduct a new sentencing in accordance with the requirements of Criminal Rule 38(a) as interpreted in this opinion.

cause "Rule 38 protects a right of 'constitutional dimension'." The court declared, however, that the decision to apply this stricter standard of reversible error was a matter of judicial policy, not a mandate of constitutional law: "We do not mean to decide that Dolchok's absence from

the in-chambers conference rose to the level of a constitutional violation." *Dolchok*, 639 P.2d at 285–86 n. 19.

**8.** But see footnote 6 above.