Talalelei EDWARDS Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A-9018.

Court of Appeals of Alaska.

May 4, 2007.

Rex Lamont Butler, Anchorage, for the Appellant.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Talalelei Edwards Jr. was convicted of second-degree murder for killing a one-year-old child who was left in his care. In this appeal, Edwards argues that the evidence was not sufficient to support his conviction (in that the evidence was not sufficient to establish that he was the one who injured the child). Edwards also asserts that his trial was flawed by various procedural and evidentiary errors. Finally, Edwards argues that he was sentenced in violation of the Sixth Amendment right to jury trial as interpreted in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

For the reasons explained here, we affirm Edwards's conviction and sentence.

*Sufficiency of the evidence to support a finding that Edwards caused the child's death*

■ Edwards asserts that the evidence presented at his trial was not sufficient to support a finding that he was the one who fatally injured the infant. At Edwards's trial, the parties actively disputed the timing of the child's injury—and, in particular, whether the child was fatally injured while in Edwards's care.

When we assess a claim of insufficient evidence, we must view the evidence in the light most favorable to upholding the jury's verdict.[1]

Viewed in the light most favorable to the verdict, the evidence showed that the child's mother went to work and left her one-year-old child in Edwards's care at around 9:00 in the morning. About two hours later, Ed-

---

1. *See, e.g., Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981).

wards's downstairs neighbor heard a loud "thump" coming from Edwards's apartment, as if something had been dropped. Approximately forty-five minutes to an hour after that, Edwards brought the child to the hospital. Edwards told the receiving nurse that he had brought the child to the hospital because the child was having difficulty breathing.

According to the nurse, Edwards's affect was flat (*i.e.,* he showed little or no emotion) and his attention was not focused on the child. The nurse testified that Edwards was the only person she had ever seen who, having brought a child with breathing problems to the hospital, was not upset or panicked.

Two doctors testified that, based on the child's medical symptoms, the child had suffered serious injury an hour or two before he was brought to the hospital. (A third doctor testified that the child's injury had been inflicted "within a few hours" of the child's arrival at the hospital.)

This evidence, in conjunction with the reasonable inferences to be drawn from it, is sufficient to support a finding that Edwards was the one who injured the child.

We acknowledge that Edwards presented evidence (including expert testimony) indicating that the child had been injured as much as five days earlier. However, as explained above, the test is whether the evidence, taken as a whole, and viewed in the light most favorable to upholding the verdict, is sufficient to support the jury's decision. We conclude that this test is met.

*Whether Edwards was improperly denied the opportunity to present photographic evidence to support his expert witness's testimony*

■ At trial, Edwards's defense attorney called Dr. Janice Ophoven to give her opinion on the issue of when the child's injuries were inflicted. Based on her examination of the medical records and her analysis of the autopsy slides, Dr. Ophoven concluded that the child's fatal injury was inflicted about five days before his death.

One of Dr. Ophoven's grounds for this opinion was her assertion that the autopsy slides showed the presence of "massive iron deposits" and an "advanced fibroblast reaction" in the child's brain and lungs. During her direct examination, Dr. Ophoven stated that she had prepared enlarged photographs of these slides to more clearly depict the iron deposits.

But when the defense attorney offered these photographs, the prosecutor objected that she had not previously seen these enlarged photographs; she told the court that she wanted some time to have her own expert examine the photographs before she decided whether to object to their admission.

Superior Court Judge Larry D. Card stated that the State was entitled to an opportunity to examine and analyze the photographic enlargements of the slides. Judge Card suggested that he would normally give the State twenty-four hours to do this, but the judge recognized that this would pose a problem for the defense—because Dr. Ophoven was scheduled to leave Anchorage that afternoon, and she had other commitments.

But when Judge Card asked for the details of Dr. Ophoven's schedule, she responded by telling the judge that she could fully present her testimony without relying on the disputed photographic enlargements of the autopsy slides:

> *The Court:* Let's talk about [the issue of] Dr. Ophoven's availability. . . . [She was promised that we would] try to get her out of here, but [now] it looks like we have some issues. So I need to talk—Dr. Ophoven needs to relate to me her situation regarding her travel. Are you prepared to address that, or do you wish . . .
>
> *Defense Attorney:* Well, . . . yes, we should probably address it, yes.
>
> *The Court* [to Dr. Ophoven]: Doctor?
>
> *Dr. Ophoven:* Just throw the pictures away. Just throw the pictures away.
>
> . . .
>
> *Defense Attorney:* Well, this is what I'm going to request, then. . . . First of all, that [the photographic enlargements] be authenticated, and that [the doctor] be allowed [to continue] with her testimony-to

talk about her findings without showing [the photographs] to the jury....

*The Court:* [I agree that] she can [testify] that she looked at the [autopsy] slides and she made notes from the slides.... And she can testify as to what she saw on the various slides.... And I'll reserve [my decision] in terms of moving to admit [the photographs], because ... at some point before the trial is over, [the State's pathologist] will have an opportunity, I suppose, . . .

*Prosecutor:* Right.

*Defense Attorney:* ... to look at them.... But I would also ask to reserve an opportunity to [re-]call Dr. Ophoven by phone and ...

*Prosecutor:* [I'm not certain I will consent to that.]

*The Court:* Well, let's do this: Let's reserve that part of it. If we're going to proceed, let's proceed. And then you folks can talk and decide what you're going to do [about the defense attorney's suggestion to have Dr. Ophoven offer additional testimony by telephone].

. . .

Let's go ahead and [have Dr. Ophoven testify] without reference to the photographs, and then we'll proceed on.

*Defense Attorney:* But she can use them while she's—I can ask her questions ...

*The Court:* Well, if ... she's looking at something [that] the jury's not looking at, ... that's fine—because it's like her notes.

*Defense Attorney:* Okay.

. . .

*Dr. Ophoven:* I can talk without [the photographs], Your Honor.

Dr. Ophoven's testimony then continued. The defense attorney never asked Judge Card to make a final ruling on the admissibility of the photographic enlargements of the autopsy slides.

■ On appeal, Edwards argues that Judge Card committed error in the handling of this matter—that Judge Card erroneously excluded the photographs. But, as can be seen from the above-quoted excerpt of the trial, Judge Card never made a final ruling

on this evidence. Instead, Dr. Ophoven mooted the issue by declaring that she could give her anticipated testimony (concerning the iron deposits in the deceased child's brain and lungs) without showing the photographs to the jury.

It is true that, ultimately, this was not a matter for Dr. Ophoven to decide. Rather, Dr. Ophoven was the defense attorney's witness, and the defense attorney had the right to decide whether the photographs were crucial to the jury's understanding of the doctor's testimony. But the defense attorney never told Judge Card that he disagreed with the doctor's appraisal (*i.e.*, the doctor's conclusion that her testimony could be fully presented without the photographs).

Indeed, after the doctor presented her testimony, the defense attorney never asked Judge Card to issue a final ruling on the admissibility of the photographs. The defense attorney's failure to take subsequent action strongly suggests that he agreed (at least at that time) with Dr. Ophoven's appraisal.

We therefore reject Edwards's claim of error for two reasons. First, the defense attorney failed to preserve an objection to Judge Card's handling of this issue. And second, Edwards has failed to show that the presentation of the defense case was prejudiced by the lack of the photographs.

*Whether Edwards was improperly denied the opportunity to present evidence that the child's mother had a short temper*

■ At trial, Edwards argued that there was a significant possibility that the child's mother had inflicted the fatal injury. In support of this theory, Edwards presented evidence that the child had suffered broken ribs in the weeks before he died, and Edwards argued that there was no evidence that these broken ribs were attributable to him. Edwards also introduced evidence that the child's mother had a "short fuse", that she used profanity toward her son, and that she was physically rough with him.

To further bolster Edwards's claim that the child's mother had a short temper, the defense attorney announced that he intended

to call two of the mother's supervisors from the bank where she worked.

The first of these witnesses was Connie Jones. The defense attorney told Judge Card that he wanted Jones to testify that the child's mother "had a short fuse" at work. Judge Card asked if Jones's testimony related solely to the mother's behavior at work, or whether Jones "[had] seen her ... around her child, [or] in her home setting, and so forth ... ?" The defense attorney answered that Jones's knowledge of the woman was confined to the workplace, and that she had no specific knowledge of the woman's behavior around children. Judge Card then ruled that the contemplated character evidence was "more prejudicial than probative"—that it was "too broad" because it went to the woman's "general character" rather than her characteristic behavior with, or reaction toward, children.

A few moments later, Judge Card further clarified his ruling:

> The Court: [If] you [have] a witness [who] will come in and say [that] they know [the mother] well enough in her home setting, [or] in her social setting, [or in] her relationship with her child, and [that] she was short with her child, [or] jerked the child, [or] beat the child up, or [other testimony] to that effect, ... then that would be an appropriate witness. [But an] employer[ ] with no more knowledge [and] no relationship [with the mother] other than work, [such as] Ms. Jones, [is not an appropriate witness.]

After receiving this ruling, the defense attorney announced that he no longer intended to call the other supervisor.

On appeal, Edwards argues that Judge Card's ruling denied him due process of law by excluding important exculpatory evidence. But we have repeatedly held that a defendant's right to due process is not infringed when a trial judge properly applies Alaska Evidence Rule 403 to exclude evidence.[2]

Here, Judge Card concluded that evidence of the mother's short temper at work had only small probative value on the issue of how she treated her own child, and Judge Card further concluded that this small probative value was outweighed by considerations of "prejudice"—that is, the danger that the proposed evidence would mislead the jury or confuse the issues.

We note that, even though Judge Card did not allow the bank supervisors to testify about the mother's "short fuse" at work, Judge Card allowed the defense to introduce a substantial amount of testimony concerning matters of more direct relevance. Three witnesses (Edwards's friend, Clifton Ziegler, Edwards's wife, and Edwards himself) testified that, during the weeks before the child's death, the child's mother repeatedly declared that the baby was "stressing [her] out" and that the baby was "getting on [her] damn nerves". These witnesses also testified that the child's mother was "rough to him" and that, on one occasion, she threw the child onto a couch.

Given the issue being litigated, given the tenor of the testimony that was admitted, and given the comparatively small relevance of the excluded testimony, we can not say that Judge Card abused his discretion under Evidence Rule 403 when he ruled that Edwards could not present the testimony of the two bank supervisors concerning the mother's short temper in the workplace.

*Edwards's claim of prosecutorial misconduct during final argument*

■ Alaska Evidence Rule 608 generally forbids a party from introducing evidence of a witness's specific past acts of dishonest conduct in order to establish the witness's general character for untruthfulness. Evidence Rule 609, however, contains an exception to this rule of preclusion: subject to certain limitations, Evidence Rule 609(a) authorizes a party to introduce evidence that a witness "has been convicted of a crime ... involv[ing] dishonesty or false statement".

Edwards took the stand at his trial, and he was impeached with evidence that he had previously been convicted of "a crime involv-

---

**2.** *See, e.g., Larson v. State*, 656 P.2d 571, 574–75 (Alaska App.1982) (a defendant's right to present evidence is properly limited by considerations of relevance and the balancing test codified in Evidence Rule 403).

ing dishonesty". (The jury was not given any further information concerning this prior crime.)

During the opening portion of her summation to the jury, the prosecutor referred to this evidence. Specifically, the prosecutor told the jurors that they "[could] consider the fact that [Edwards] has a criminal conviction relating to honesty [*sic*] and ... false statement."

Edwards's attorney did not object to the prosecutor's statement at the time. However, after the jury retired to commence its deliberations (*i.e.*, after the defense attorney had delivered his summation to the jury, and after the prosecutor had delivered the rebuttal portion of her summation), the defense attorney announced that he planned to seek a new trial because the prosecutor had referred to "a criminal conviction relating to [dis]honesty and ... false statement". The defense attorney contended that the prosecutor, by referring both to dishonesty and false statement, had led the jury to believe that Edwards had committed two prior crimes, not just one.

The defense attorney told Judge Card that he believed that this was a sufficient ground for declaring a mistrial. However, the defense attorney also told Judge Card that Edwards and his family did not have the resources to finance a second trial. Because of these competing considerations, the defense attorney told Judge Card that he wished to consult Edwards and his family before deciding what to do.

Judge Card responded by warning the defense attorney that the jury was already deliberating, and therefore the attorney had to make a decision quickly. The judge told the defense attorney, "I think you either make [a] motion [for a mistrial] or you don't." Judge Card then declared a recess to give the defense attorney some time to consider the matter.

When the recess ended, the defense attorney told Judge Card that he needed still more time to make a decision. Judge Card responded that he (the judge) needed to make a decision, one way or the other, before the jury returned its verdict-that he would

not hold Edwards's motion for mistrial under advisement until after the jury decided the case.

At this point, the defense attorney told Judge Card that he had not yet actually made a motion for a mistrial. The defense attorney said, "I didn't really make [such a] motion to the court; I just said that we *might* be doing that.... [That is just] something that we might do. But I didn't actually say, 'Judge, I move for a mistrial'—because I wouldn't do that without talking to the Edwards family...." (Emphasis added)

At this point, Judge Card told the defense attorney that, with respect to any potential motion for a mistrial, he viewed the motion either as having never been made, or as having been withdrawn. Judge Card said, "There is no motion pending," and the defense attorney replied, "All right, sir."

No further action was taken until the jury found Edwards guilty. Then Edwards filed a motion for a new trial, claiming that he had been prejudiced by the prosecutor's remark about "a criminal conviction relating to [dis]honesty and ... false statement".

From the foregoing description of events, it is clear that the defense attorney recognized that there was a potential ground for seeking a mistrial, but the defense attorney refrained from pursuing the motion until he learned the jury's decision. By pursuing this course of action—that is, by gambling on the jury's verdict—the defense attorney waived any potential claim of error. As the Alaska Supreme Court declared in *Owens v. State*, 613 P.2d 259, 261 (Alaska 1980), a defendant should not be allowed to "take a gambler's risk and complain only if the cards [fall] the wrong way". *See also Allen v. State*, 51 P.3d 949, 953 (Alaska App.2002); *Turpin v. State*, 890 P.2d 1128, 1130 (Alaska App.1995).

*Edwards's attacks on the indictment*

██ Before his trial, Edwards asked the superior court to dismiss the indictment. He argued that the evidence presented to the grand jury was insufficient to establish that he was the cause of the infant's death.

At the grand jury, the child's mother testified that she left for work at around 9:00 a.m., and that she left her infant son in

Edwards's care. At that time, the child was awake. The child cried a little when she left, but he was sitting on the bed with Edwards's young son, watching television.

Edwards's downstairs neighbor and apartment manager testified that, in the middle of the morning, she heard a "very loud thump" in the apartment above her—so loud that she and her sons (who were preparing for their home school lessons) stopped what they were doing. Within the hour, the apartment manager saw Edwards carrying the infant to his car. The child "wasn't moving at all". When the apartment manager asked Edwards how his day was going, Edwards responded, "Oh, things are great; things are fine." However, Edwards appeared to be in a hurry, and he immediately departed in his car.

The State's pathologist, Dr. Frank Fallico, testified that, based on the results of the autopsy, the infant died as a result of "multiple blunt-force shaking injuries", which the doctor defined as including hitting the infant with an object or causing the infant to hit an object. Fallico explained that, based on the observed injuries, the infant was subjected to "a great deal of force", a force equivalent to "a high-speed automobile crash" or "a fall from great height"—but with the crucial difference that the force was applied to the child's body in a "twisting" or "rotational" direction, as opposed to the linear force that is characteristic of an actual fall.

The child's mother testified that, around 11:45 a.m., Edwards called her at work to say that he was taking her child to the hospital because the child was having trouble breathing. When the child's mother met Edwards at the hospital, Edwards told her that the infant had been sleeping on a couch for about two hours, and that he first noticed that something was wrong when he tried to wake the infant up and the infant would not respond. According to the mother, Edwards told her that the child "was kind of out of it, and ... didn't seem [to be] breathing well", so Edwards decided to take the child to the hospital.

But Dr. Fallico's testimony suggested that Edwards's version of events was unlikely. As explained above, Fallico testified that the child died from multiple blunt-force shaking injuries. Fallico also testified that "very, very soon" after suffering such injuries, the child would have demonstrated both an observable difficulty in breathing and an altered consciousness. These changes in the child's behavior would be obvious even to an observer who had no medical training: "An average person without medical knowledge would know, very soon after the event, that something was very wrong with the baby."

In other words, Dr. Fallico's testimony suggested that Edwards could not be telling the truth when he said that the child was acting normally when he put the child down for a nap and then, two hours later, without intervening incident, the child was unresponsive and could not breath properly. The doctor's testimony, coupled with the apartment manager's description of what she heard and saw, was sufficient to support a reasonable conclusion that the child suffered his fatal injuries while he was in Edwards's sole care.

We conclude that this evidence was sufficient to warrant an indictment for second-degree murder.[3]

On appeal, for the first time, Edwards argues that the grand jury process was flawed for a different reason. He contends that a police witness improperly gave what amounted to expert testimony on the expected behavior of infants who have suffered serious blunt-force or shaking injuries. This contention was not raised in the superior court. It is therefore waived.

See Alaska Criminal Rule 12(b)(1), which states that any defense claim relating to "defects in the institution of the prosecution" must be raised before trial, and Criminal Rule 12(e), which states that the defendant's failure to timely raise such a claim "shall constitute [a] waiver" of that claim.

*Edwards's claim that the jury's verdicts are inconsistent*

3. *See Cathey v. State,* 60 P.3d 192, 195–96 (Alaska App.2002); *Sheldon v. State,* 796 P.2d 831, 836–37 (Alaska App.1990) (a grand jury should return an indictment when the grand jury is "convinced of the probability of the defendant's guilt").

■ For reasons that are not obvious from the record, the State asked the grand jury to indict Edwards on alternative counts of second-degree murder and manslaughter, even though, under the facts of Edwards's case, these two charges stood in the relationship of greater offense and lesser included offense.[4] And at the end of Edwards's trial, the jurors were asked to return separate verdicts on each of these two counts; they were told that their "verdict on one count should not control [their] verdict on [the] other".

(Normally, in such circumstances, the jury would be told: (1) that second-degree murder was the greater offense; (2) that if the jurors unanimously convicted the defendant of second-degree murder, they should cease deliberating; and (3) that the jurors would be allowed to return a verdict (whether "guilty" or "not guilty") on the manslaughter charge only if the jurors simultaneously acquitted the defendant of the second-degree murder charge. *See Dresnek v. State*, 697 P.2d 1059 (Alaska App.1985), *affirmed* 718 P.2d 156 (Alaska 1986).)

Because the jurors were instructed that they must return verdicts on both the murder and the manslaughter charges (that is, they were instructed to return a verdict on the manslaughter charge regardless of their verdict on the greater charge of second-degree murder), and because the jurors were also told that their verdict on one count "should not control" their verdict on the other, Judge Card recognized that there was a danger of verdict inconsistency that normally does not arise in such cases.

As just explained, when a jury is instructed on both a greater offense and a lesser included offense, the jurors are normally told to cease their deliberations if they find the defendant guilty of the greater offense, and to return no verdict on the lesser offense in that circumstance. But Edwards's jurors were told that it was their duty to return verdicts on both offenses, even if they found Edwards guilty of second-degree murder. Judge Card recognized that, in this circumstance, there was a theoretical possibility that the jurors might return a "guilty" verdict on second-degree murder (*i.e.*, the greater offense), but a "not guilty" verdict on the lesser included offense of manslaughter.

When Judge Card suggested to the parties that a "not guilty" verdict on the manslaughter count would be inconsistent with a "guilty" verdict on the second-degree murder count, Edwards's attorney agreed with Judge Card that it would be inconsistent for the jury to acquit Edwards of manslaughter and, at the same time, convict him of murder.

Apparently to forestall this possibility, the prosecutor (in her summation) urged the jurors to think of the manslaughter count as the first step in their analysis of the murder count. That is, she advised the jurors to first decide whether the State had proved that Edwards was the one who injured the child, and that Edwards had recklessly disregarded the risk that his actions would result in the child's death. Then, if the jurors answered these questions in the affirmative, the jurors should next decide whether the State had proved that Edwards acted with the kind of extreme recklessness required for second-degree murder: conduct "manifesting an extreme indifference to the value of human life".

The jury ultimately found Edwards guilty of both second-degree murder and manslaughter. (Judge Card merged these verdicts at Edwards's sentencing.) Seemingly, this ended any possibility of inconsistent verdicts. But six months after the jury returned its verdicts, Edwards moved for a new trial—alleging that the jury's verdicts were inconsistent.

The alleged inconsistency arose from the wording of the manslaughter verdict. Judge Card instructed the jurors in accordance with

---

**4.** At oral argument, the State's attorney declared that this mode of charging was required by this Court's decision in *Whiteaker v. State*, 808 P.2d 270 (Alaska App.1991). In *Whiteaker*, this Court decided that when the jury in a murder trial has unanimously voted to acquit the defendant of the murder charge but is deadlocked on a lesser degree of criminal homicide (for example, man-slaughter), the defendant is entitled to have the court enter an acquittal of the greater charge-so that, in any retrial, the defendant will face only the lesser charges on which the jury could not reach agreement. *Id.*, 808 P.2d at 274–78. We do not see how our decision in *Whiteaker* requires the kind of homicide indictment that the State requested in Edwards's case.

the wording of the manslaughter statute, AS 11.41.120(a)(1): that is, he instructed the jurors that they should convict Edwards of manslaughter only if the State proved beyond a reasonable doubt (1) that Edwards "intentionally, knowingly, or recklessly caused the death of [the child]"; and (2) that Edwards did so "under circumstances not amounting to murder in the ... second degree".

Edwards argued (and continues to argue on appeal) that the jury's manslaughter verdict is inconsistent with its second-degree murder verdict-because, if the jury indeed found Edwards guilty of killing the child "under circumstances not amounting to murder in the ... second degree", then the jury could not rationally, at the same time, also find Edwards guilty of killing the child under circumstances that *did* amount to murder in the second degree.

Before we explain why we reject Edwards's claim of verdict inconsistency, we wish (as a preliminary matter) to formally endorse the construction of the manslaughter statute that we first expressed twelve years ago in an unpublished decision: *Buie v. State*, Alaska App. Memorandum Opinion No. 3100 (March 29, 1995), 1995 WL 17220362.

The statutory phrase "under circumstances not amounting to murder in the first or second degree" does not constitute an element of the offense of manslaughter. Rather, this language means that a manslaughter conviction should be entered unless the jury concludes that the unlawful homicide is not just a manslaughter, but rather constitutes a murder. That is, we construe AS 11.41.120(a)(1) to mean: A person commits the crime of manslaughter if he or she intentionally, knowingly, or recklessly causes the death of another person, unless the finder of fact concludes, beyond a reasonable doubt, that the homicide is murder in either the first or second degree.

As we pointed out in *Buie*, if the language in question were construed as an element of manslaughter—that is, if the State were required to prove beyond a reasonable doubt that an act charged as manslaughter did not constitute murder in either the first or sec-

ond degree—then juries would be required to acquit the defendant of *both* murder *and* manslaughter whenever there was a reasonable doubt as to whether the defendant's act of homicide constituted murder as opposed to manslaughter. *Buie*, Memorandum Opinion No. 3100 at pp. 32–34, 1995 WL 17220362 at *16–17.

We do not believe the legislature intended this. Rather, we conclude that the legislature intended manslaughter to be a residual category of unlawful homicide, encompassing any unlawful killing done with recklessness, knowledge, or intent unless the State proves that the killing constitutes first- or second-degree murder.

■ If the jury finds that the defendant committed an unlawful homicide and acted with recklessness, knowledge, or intent, but if the jury has a reasonable doubt as to whether the State has proved murder, then the defendant is entitled to the benefit of the jury's doubt and must be convicted only of manslaughter. But at the same time, the fact that the jury may believe that there is a reasonable possibility, or even a likelihood, that the defendant's conduct constituted murder does not entitle the defendant to be acquitted of manslaughter.

■ Thus, the manslaughter instruction that Edwards's jury received was flawed. It was wrong to tell the jurors that they could not convict Edwards of manslaughter unless they found, beyond a reasonable doubt, that the homicide did not amount to murder in the first or second degree.

This clarification of the law of manslaughter does not, however, resolve the problem of verdict inconsistency in Edwards's case. Even though the jury received an erroneous manslaughter instruction, the jurors were operating under that instruction-thus raising the possibility that the jurors' verdicts were inconsistent in the manner that Edwards alleges. Nevertheless, we reject Edwards's argument for three reasons.

First, Edwards did not object (in any pertinent way) to the jury instructions on the relationship between the two charges, nor

did he object (at the time) to the entry of the jury's two verdicts.

Although the Alaska Supreme Court has declared that logically inconsistent verdicts can be attacked on appeal as "plain error" (that is, attacked on appeal even if the verdicts were not attacked in the trial court),[5] a showing of plain error includes a showing that the defense attorney had no tactical reason for failing to make a contemporaneous objection.[6] We have previously noted that a defense attorney who believes that the jury's verdicts may be inconsistent often has a powerful tactical reason to withhold any objection until the trial judge accepts the verdicts and discharges the jury.

As we explained in *Hansen v. State*, 845 P.2d 449, 454–55 (Alaska App.1993), if a defense attorney alerts the trial judge to the problem of an inconsistency in the jury's verdicts, the trial judge would normally advise the jurors that their verdicts are inconsistent and can not be accepted, and the judge would then direct the jurors to return to their deliberations—leaving open the possibility that the jurors would resolve the inconsistency in the State's favor. Or, in a case like Edwards's, a timely objection would have alerted the trial judge to the troublesome language in the manslaughter instruction, and the problem could likely have been solved by asking the jury to clarify its decision.

Instead, by withholding an objection until the jury is discharged and the matter is beyond remedy, a defense attorney gains a new trial on any charges of which the defendant was convicted, and at the same time precludes a new trial on any charges of which the defendant was acquitted (because of the guarantee against double jeopardy). Under such circumstances, Alaska law will normally not allow a defendant to advance a claim of plain error.

A second reason we are unwilling to entertain Edwards's claim of inconsistent verdicts is that, as we have already described, Edwards's attorney made exactly the *opposite* argument to Judge Card concerning the interplay between the verdicts on second-degree murder and manslaughter. As explained above, Edwards's attorney expressly agreed with Judge Card when the judge suggested that an inconsistency would arise if the jurors convicted Edwards of second-degree murder but acquitted Edwards of manslaughter. Now, on appeal, Edwards's attorney is arguing that this very combination of conviction and acquittal was the *only* way that the jurors could render a *consistent* decision—and that an irreconcilable inconsistency arises from the fact that the jury voted to convict Edwards of both counts.

Thus, even if one might argue that Judge Card should have recognized a potential legal problem when the jury convicted Edwards of both second-degree murder and manslaughter (given the wording of the manslaughter instruction), Edwards's attorney significantly contributed to the error—by misdirecting Judge Card, telling him that the potential problem lay elsewhere.

Finally, we reject Edwards's claim because any claim of inconsistent verdicts must be evaluated in light of the jury instructions taken as a whole,[7] and in light of the summations of the parties.[8] If the record "reveals a basis upon which the jury's verdict[s] can rationally be explained", the verdicts will be upheld. *Davenport v. State*, 543 P.2d 1204, 1208 (Alaska 1975).

Here, because of the unusual way in which the indictment was framed, the jurors were told to return separate verdicts on second-degree murder and manslaughter even though these two counts of the indictment stood in the relationship of greater offense and lesser included offense. This provides a ready explanation for the fact that the jurors

---

5. *DeSacia v. State*, 469 P.2d 369, 373 (Alaska 1970).

6. *Jackson v. American Equity Ins. Co.*, 90 P.3d 136, 144 (Alaska 2004); *Henry v. State*, 861 P.2d 582, 589 (Alaska App.1993); *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989); *Potts v. State*, 712 P.2d 385, 394 n. 11 (Alaska App.1985).

7. *See Brown v. Anchorage*, 915 P.2d 654, 660 (Alaska App.1996).

8. *See Norris v. State*, 857 P.2d 349, 355 (Alaska App.1993); *O'Brannon v. State*, 812 P.2d 222, 229 (Alaska App.1991).

returned separate verdicts on each of these two degrees of homicide (rather than returning only one verdict finding Edwards guilty of the greater charge, second-degree murder).

And although the wording of the manslaughter instruction is susceptible of the interpretation that Edwards urges on appeal—the interpretation that the jurors should convict Edwards of manslaughter only if they acquitted him of second-degree murder—the jurors were in fact told something different in the other instructions and in the prosecutor's summation. As explained above, the jurors were urged to view their decision on the manslaughter count as a legally separate but preliminary stage of their consideration of the murder charge. The prosecutor suggested that the jurors first decide if Edwards was guilty of manslaughter—and if jurors found him guilty of manslaughter, they should then move on to decide whether Edwards demonstrated such an extreme degree of recklessness that he should be found guilty of second-degree murder under an "extreme indifference" theory.

The prosecutor (without objection) urged the jurors to find Edwards guilty of *both* second-degree murder and manslaughter. In fact, the prosecutor (again, without objection) told the jurors, "If you agree that [Edwards] committed murder in the second degree, [then] you are, by definition, finding that [Edwards] committed manslaughter."

It is true that the manslaughter instruction, read in isolation, might suggest that if the jurors ultimately decided that Edwards was guilty of second-degree murder, they should then go back and alter their decision (*i.e.,* acquit Edwards) on the manslaughter charge. But the jurors were also instructed that the two charges were independent—that "[their] verdict on one count should not control [their] verdict on [the] other". Thus, reasonable jurors could conclude that they should leave their manslaughter verdict alone, regardless of how they decided the issue of second-degree murder.

We therefore conclude that there is no fatal inconsistency in the jury's decisions to convict Edwards of both second-degree murder and manslaughter.

We do, however, wish to point out—to trial judges and to the Department of Law—that this problem would not have arisen had the jury received standard instructions (the kind of instructions described in *Dresnek* ) concerning the greater-lesser relationship between second-degree murder under an "extreme indifference to the value of human life" theory and manslaughter. As explained above, when jurors are confronted with a greater offense and one or more lesser included offenses, the jurors are normally instructed that they are free to deliberate on the different charges in any order they wish, but they should return a verdict on the lesser offense(s) only if they find the defendant not guilty of the greater offense.

*Edwards's argument that second-degree murder defendants have a Sixth Amendment right to jury trial concerning the factors listed in AS 12.55.125(b) that trigger a higher mandatory minimum sentence*

 As noted above, the jury convicted Edwards of second-degree murder. Under AS 12.55.125(b), the sentencing range for this crime is normally 10 to 99 years' imprisonment. However, this statute also provides that the mandatory minimum term of imprisonment is increased to 20 years if "the murder [is] of a child under 16 years of age and the court finds by clear and convincing evidence that the defendant ... was [the child's] natural parent, ... stepparent, [adoptive] parent, [or] legal guardian, or [occupied] a position of authority in relation to the child".

 (The phrase "position of authority" is defined in AS 11.41.470(5). This category includes babysitters.)

The State contended that Edwards was subject to the higher, 20–year mandatory minimum sentence because he killed a one-year-old child who was in his care. Edwards responded that, under *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), he was entitled to a jury trial on these two issues of fact—*i.e.,* whether the child was under the age of 16, and whether Edwards occupied a position of au-

thority over the child at the time of the homicide.

Judge Card ruled that these two issues of fact were not covered by *Blakely*, and thus he could decide these issues without a jury. Then, applying a "clear and convincing evidence" burden of proof, Judge Card found that the State had proved both of the facts that triggered the higher mandatory minimum term of imprisonment: (1) that the victim was under the age of 16, and (2) that Edwards occupied a position of authority over the victim.

On appeal, Edwards renews his claim that, under the Sixth Amendment, he was entitled to a jury trial on these two issues of fact. But in *State v. Malloy*, 46 P.3d 949, 954–55, 956 (Alaska 2002), the Alaska Supreme Court held that the Sixth Amendment right to jury trial does not apply to issues of fact that increase the mandatory minimum term of imprisonment for a crime (as opposed to issues of fact that increase the potential *maximum* term of imprisonment for a crime).

It is true that *State v. Malloy* was decided in 2002—that is, after the United States Supreme Court's decision in *Apprendi v. New Jersey*,[9] and after the Alaska Supreme Court's own earlier decision in *Donlun v. State*,[10] but before the United States Supreme Court decided *Blakely v. Washington*. However, this Court recently held that the *Blakely* decision does not undermine the Alaska Supreme Court's analysis in *Malloy*. See *Malloy v. State*, 153 P.3d 1003, 1009–10 (Alaska App.2007).

For these reasons, we reject Edwards's contention that, under the Sixth Amendment, he was entitled to a jury trial on the two issues of fact that triggered the higher mandatory minimum term of imprisonment.

Edwards makes a related argument based on state law. He notes that AS 12.55.125(b) specifies that the "clear and convincing evidence" standard of proof governs the sentencing court's decision on the question of the defendant's relationship to the victim— *i.e.*, whether the defendant was the parent, stepparent, adoptive parent, or legal guard-

ian, or whether the defendant occupied a position of authority in relation to the child. At the same time, however, the statute is silent regarding the burden of proof that governs the other issue of fact—*i.e.*, whether the victim was younger than 16 years. Based on the statute's silence on this issue, Edwards asserts that the legislature must have intended the victim's age to be an element of the offense—something to be included in the indictment and later proved to the trial jury beyond a reasonable doubt.

■ We do not draw this conclusion from the legislature's silence. We note that in *State v. Malloy*, 46 P.3d at 954–55, 956, the Alaska Supreme Court considered the corresponding provisions of AS 12.55.125(a)—*i.e.*, the factual issues that trigger a higher mandatory minimum sentence for first-degree murder—and concluded that these issues of fact were *not* elements of the offense under the Alaska test announced in *Donlun v. State*. We likewise conclude that the factual issues that trigger the higher mandatory minimum sentence for second-degree murder are not elements of the offense.

We further conclude that the legislature's failure to specify a burden of proof on the issue of the victim's age appears to stem from faulty drafting rather than intentional policy. We interpret AS 12.55.125(b) to require the same level of proof—*i.e.*, proof by clear and convincing evidence—on both issues of fact that trigger the higher mandatory minimum term of imprisonment.

*Edwards's claim that his sentence is excessive*

■ Judge Card sentenced Edwards to 20 years' imprisonment. This is the minimum sentence allowed under AS 12.55.125(b) for defendants in Edwards's circumstances— that is, for defendants who commit second-degree murder when the victim was under the age of 16 and the defendant occupied a position of authority over the victim. Nevertheless, Edwards claims that this sentence is excessive.

---

**9.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**10.** 527 P.2d 472 (Alaska 1974).

The purpose of appellate sentence review is to correct abuses of sentencing discretion-to ensure that criminal sentences fall within a permissible range of reasonable sentences.[11] But under the facts as found by Judge Card, the judge had no discretion to sentence Edwards to less than 20 years' imprisonment. Accordingly, as a matter of law, Edwards's sentence of 20 years' imprisonment is not "excessive" for purposes of sentence review.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

11. *See State v. Hodari*, 996 P.2d 1230, 1232 (Alaska 2000), quoting this Court's decision in *Erickson v. State*, 950 P.2d 580, 586 (Alaska App. 1997).